William J. Honan
Michael J. Frevola
Francesca Morris
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York  10007-3189
(212) 513-3200
E-mail:  william.honan@hklaw.com
         michael.frevola@hklaw.com
         francesca.morris@hklaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
                                                    :
STOLTHAVEN HOUSTON, INC.,                            :
                                                    :
                          Plaintiff,                :        08 Civ. 4327 (RPP)
                                                    :
              v.                                     :
                                                    :
RACHEL B, its engines, tackle apparel, etc., *in rem*,   :        **DECLARATION OF MR.**
and HILTVEIT ASSOCIATES, INC. and                   :        **MORTEN E. WERRING IN**
ZAREPTA CHEMICAL KS, *in personam*,                 :        **SUPPORT OF MOTION TO**
                                                    :        **VACATE ATTACHMENT**
                          Defendants.               :
                                                    :
---------------------------------------------------------------------x

          Mr. Morten E. Werring, being duly sworn in accordance with 28 U.S.C. § 1746, declares

and states:

          1.     I am the Chairman of Defendant Zarepta Chemical KS ("Zarepta") a defendant in

this matter.  I am familiar with the facts stated herein through my position with Zarepta, my

review of Zarepta's files and my communications with colleagues at Zarepta.

          2.     Zarepta is the owner of the "MV Rachel B" (the "Vessel").

          3.     By bareboat charter, dated May 25, 2004, Zarepta entered into a bareboat charter

for the Vessel with Norfolk LP believed to have a place of business at 150 Motor Parkway,

Hauppauge, NY 11788 ("Norfolk") through Norfolk's apparent general partner, Hiltveit Associates Inc. ("Hiltveit").   A true and correct copy of the bareboat charter and riders (together the "Bareboat Charter") is attached hereto as Exhibit A.

      4.     The Vessel was delivered to Norfolk on 28th May 2004 / 12:02 pm New York time.  The initial period for the Bareboat Charter is eight years according to Rider Clause 34(b)(i).

      5.     At the time of events alleged in the Complaint in this action, March 2008, the Vessel was being operated by Norfolk under the Bareboat Charter.

      6.     In accordance with the terms of the Bareboat Charter, Norfolk is responsible for "all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the vessel under this Charter."  (Ex. A, Bareboat Charter ¶ 9(b)).

      7.     Zarepta has no liability regarding services provided to the Vessel during the term of the Bareboat Charter and, particularly, has no liability to the plaintiff Stolthaven Houston, Inc. for wharfage and other of its alleged services.

      8.     Zarepta has no corporate relationship with Norfolk, the Vessel's bareboat charterer nor with Hiltveit.

      9.     Attached hereto as Exhibit B is a true and correct copy of Invoice #V-1831 from BTMU Capital Corporation, Bank of Tokyo-Mitsubishi UFJ, to Zarepta dated May 23, 2008 in the amount of $491,138.69.

      10.    Attached hereto as Exhibit C is a true and correct copy of the instructions for payment to BTMU Capital Corporation in the amount of $491,138.69.  This was the payment under Invoice # V-1831.  Of these funds, the amount of $318,310.17 has been attached.

11.    The payment that has been attached is completely unrelated to Norfolk or Hiltveit and has no relationship to Stolthaven's claim.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

NAME: Morten E. Werring

Executed this 11th day of June, 2008 in Oslo, Norway.

# 5396713_v1

4

**EXHIBIT A**

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen
in 1974 as "Barecon 'A'" and "Barecon 'B'"
Revised and amalgamated 1989

Printed by BIMCO's idea

Adopted by
the Documentary Committee of The
Japan Shipping Exchange, Inc., Tokyo

Copyright, published by
The Baltic and International Maritime Council
(BIMCO), Copenhagen, September 1989

| | |
|---|---|
| 1. Shipbroker | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)<br>STANDARD BAREBOAT CHARTER<br>CODE NAME: "BARECON 89"<br>**PART I** |
| | 2. Place and date<br>Oslo, 2 May 2004 |
| 3. Owners/Place of business<br>**Zarepta Chemical KS**<br>c/o Morten Werrings Rederi AS<br>Strandveien 50 D<br>1366 Lysaker | 4. Bareboat charterers (Charterers)/Place of business<br>**Norfolk L.P.**<br>KILTVEIT ASSOCIATES INC. GP<br>150 MOTOR PARKWAY<br>HAUPPAUGE, NY 11788 |
| 5. Vessel's name, Call Sign and Flag (Cl. 9(c))<br>**MV "Rachel B", IMO no. 8603729, Liberian Flag** | |
| 6. Type of vessel<br>**Oil and Chemical Carrier** | 7. GRT/NRT<br>**7,955 / 4,711** |
| 8. When/Where built<br>**1987 Kyokuyo, Japan** | 9. Total DWT (abt.) in metric tons on summer freeboard<br>**13,749 MT** |
| 10. Class (Cl. 9)<br>**ABS + A1 Oil and Chemical Carrier E + AMS** | 11. Date of last special survey by the Vessel's classification society |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 14) | |
| 13. Port or Place of delivery (Cl. 2)<br>**whenever ready at sea or in port** | 14. Time for delivery (Cl. 3)<br>**See clause 33** | 15. Cancelling date (Cl. 4)<br>**31st May 2004** |
| | 16. Port or Place of redelivery (Cl. 14)<br>**one safe and ice free port, world wide with I.W.L. in charterers option, always afloat.** | |

| | |
|---|---|
| 17. Running days' notice if other than stated in Cl. 3 | 18. Frequency of dry-docking if other than stated in Cl. 9(f)<br>**as required by class or by sub-charterers** |
| 19. Trading Limits (Cl. 5)<br>**World Wide always within I.W.L. Charterers are allowed to breach I.W.L. paying any extra insurance premiums arising therefrom, but always in accordance with and to comply with cl. 12. and 48 of this clp.** | |
| 20. Charter period<br>**Subject to Clauses 34 and 35, 8 years plus 5 years in charterers option** | 21. Charter hire (Cl. 10)<br>**As per Clauses 36 and 38** |
| 22. Rate of interest payable acc. to Cl. 10(f) and, if applicable, acc. to PART IV | 23. Currency and method of payment (Cl. 10)<br>**United States Dollars** |
| 24. Place of payment; also state beneficiary and bank account (Cl. 10)<br>**See Clause 36** | 25. Bank guarantee/bond (sum and place) (Cl. 22) (optional) |
| 26. Mortgage(s), if any, (state whether Cl. 11(a) or (b) applies; if 11(b) applies state date of Deed(s) of Covenant and name of Mortgagee(s)/Place of business) (Cl. 11)<br>**Owners option** | 27. Insurance (marine and war risks) (state value acc. to Cl. 12(f) or, if applicable, acc. to Cl. 13(k)) (also state if Cl. 13 applies)<br>**See Clause 48** |
| 28. Additional insurance cover, if any, for Owners' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g)) | 29. Additional insurance cover, if any, for Charterers' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g)) |
| 30. Latent defects (only to be filled in if period other than stated in Cl. 2) | 31. War cancellation (indicate countries agreed) (Cl. 24)<br>**USA, Great Britain, Fed rep of Germany and Norway, see Clauses 24 c. and 41** |
| 32. Brokerage commission and to whom payable (Cl. 25)<br>**No commissions** | |
| 33. Law and arbitration (state 26.1., 26.2., or 26.3. of Cl. 26 as agreed; if 26.3. agreed, also state place of arbitration) (Cl. 26)<br>**See Clause 56** | 34. Number of additional clauses covering special provisions, if agreed<br>**32 - 56** |
| 35. Newbuilding Vessel (indicate with "yes" or "no" whether Part III applies) (optional) | 36. Name and place of Builders (only to be filled in if Part III applies) |

This document is computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.





"BARECON 89" Standard Bareboat Charter                                    PART I

| 37. Vessel's Yard Building No. (only to be filled in if Part III applies) | 38. Date of Building Contract (only to be filled in if Part III applies) |
|---|---|
| 39. Hire/Purchase agreement (indicate with "yes" or "no" whether Part IV applies) (optional) | 40. Bareboat Charter Registry (indicate with "yes" or "no" whether Part V applies) (optional) |
| 41. Flag and Country of the Bareboat Charter Registry (only to be filled in if Part V applies) | 42. Country of the Underlying Registry (only to be filled in if Part V applies) |

PREAMBLE. - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and shall only form part of this Charter if expressly agreed and stated in the Boxes 35, 39 and 40. If PART III and/or PART IV and/or PART V apply, it is further mutually agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | *NORFOLK LP ASSOCIATES INC, G.P.* |

ATTORNEY-IN-FACT

EILERT H. LUND

PRES.

This document is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
## "BARECON 89" Standard Bareboat Charter

1. **Definitions**
In this Charter, the following terms shall have the meanings hereby assigned to them: 1 2 3
"The Owners" shall mean the person or company registered as Owners of the Vessel. 4 5
"The Charterers" shall mean the Bareboat charterers and shall not be construed to mean a time charterer or a voyage charterer. 6 7

2. **Delivery** (not applicable to newbuilding vessels) 8
The Vessel shall be delivered and taken over by the Charterers at the port or place indicated in Box 13, in such ready berth as the Charterers may direct. ~~The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy and in every respect ready in hull, machinery and equipment for service under this Charter. The Vessel shall be properly documented at time of delivery.~~ 9 10 11 12 13 14
The delivery to the Charterers of the Vessel and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under Clause 2, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be responsible for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under the Charter, provided such defects have manifested themselves within 18 months after delivery unless otherwise provided in Box 20. See also Clause 33 15 16 17 18 19 20 21 22 23 24

3. **Time for Delivery** (not applicable to newbuilding vessels) See Clause 33 25
~~The Vessel to be delivered not before the date indicated in Box 14 unless with the Charterers' consent.~~ 26 27
~~Unless otherwise agreed in Box 17, the Owners to give the Charterers not less than 30 running days' preliminary and not less than 14 days' definite notice of the date on which the Vessel is expected to be ready for delivery.~~ 28 29 30
~~The Owners to keep the Charterers closely advised of possible changes in the Vessel's position.~~ 31 32

4. **Cancelling** (not applicable to newbuilding vessels) 33
~~Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers to have the option of cancelling this Charter without prejudice to any claim the Charterers may otherwise have on the Owners under the Charter.~~ 34 35 36 37
~~If it appears that the Vessel will be delayed beyond the cancelling date, the Owners shall, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) hours of the receipt by the Charterers of such notice. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be regarded as a new cancelling date for the purpose of this Clause.~~ 38 39 40 41 42 43 44 45 46

5. **Trading Limits** 47
The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 19. 48 49
The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the instruments of insurance (including any warranties expressed or implied therein) without first obtaining the consent to such employment of the Insurers and complying with such requirements as to extra premium or otherwise as the Insurers may prescribe. If required, the Charterers shall keep the Owners and the Mortgagees advised of the intended employment of the Vessel. 50 51 52 53 54 55 56
The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the UN or the law of any 57 58
country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation. 59 60 61
Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof. 62 63 64 65 66 67

6. **Surveys** (not applicable to newbuilding vessels) See Clauses 33 (f) and 53 68
Survey on Delivery and Redelivery. - The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. ~~The Owners shall bear all expenses of the On-Survey including loss of time, if any, and~~ The Charterers shall bear all expenses of the Off-Survey including loss of 69 70 71 72 73

time, if any, at the rate of hire per day or pro rata, also including in each case the cost of any docking and undocking, if required, in connection herewith. 74 75

7. **Inspection** 76
Inspection. - The Owners shall have the right at any time to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf to ascertain the condition of the Vessel for a reasonable period of time, at reasonable intervals, who shall act as an observer of the running of the Vessel only, but will not interfere with same, and satisfy themselves that the Vessel is being properly repaired and maintained. Inspection or survey in dry-dock shall be made only when the Vessel shall be in dry-dock for the Charterers' purpose. However, the Owners shall have the right to require the Vessel to be dry-docked for inspection if the Charterers are not docking her at normal classification intervals. The fees for such inspection or survey shall in the event of the Vessel being found to be in the condition provided in Clause 9 of this Charter be payable by the Owners and shall be paid by the Charterers only in the event of the Vessel being found to require repairs or maintenance in order to achieve the condition so provided. All time taken in respect of inspection, survey or repairs shall count as time on hire and shall form part of the Charter period. 77 78 79 80 81 82 83 84 85 86 87 88 89 90
The Charterers shall also permit the Owners to inspect the Vessel's log books whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel. For the purpose of this Clause, the Charterers shall keep the Owners advised of the intended employment of the Vessel. 91 92 93 94 95

8. **Inventories and Consumable Oil and Stores** 96
A complete inventory of the Vessel's entire equipment, outfit, appliances and ~~of all consumable stores on board the Vessel shall be made by the Charterers in conjunction with the Owners on delivery and again on redelivery of the Vessel. The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, water~~ and unbroached provisions, paints, oils, ropes and other consumable stores in the said Vessel at the then current market prices at the ports of delivery and redelivery, respectively. 97 98 99 100 101 102 103 104

9. **Maintenance and Operation** See also Clause 45 b) 105
(a) The Vessel shall during the Charter period be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, ~~except as provided for in Clause 13 (i),~~ they shall keep the Vessel with unexpired classification of the class indicated in Box 10 and with other required certificates in force at all times. The Charterers to take immediate steps to have the necessary repairs done within a reasonable time failing which the Owners shall have the right of withdrawing the Vessel from the service of the Charterers without noting any protest and without prejudice to any claim the Owners may otherwise have against the Charterers under the Charter. 106 107 108 109 110 111 112 113 114 115 116 117 118
~~Unless otherwise agreed, in the event of any improvement, structural changes or expensive new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation such improvements, structural changes or new equipment to be for Charterer's expense and time costing more than 5 per cent of the Vessel's marine~~ 119 120 121 122
insurance value as stated in Box 27, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under the Charter, shall in the absence of agreement, be referred to arbitration according to Clause 26. 123 124 125 126 127 128
The Charterers are required to establish and maintain financial security or responsibility in respect of oil or other pollution damage as required by any government, including Federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so. 129 130 131 132 133 134 135 136 137 138 139 140 141
~~TOVALOP SCHEME. (Applicable to oil tank vessels only) - The Charterers are required to enter the Vessel under the TOVALOP SCHEME or under any similar compulsory scheme upon delivery under this Charter and to maintain her so during the currency of this Charter.~~ 142 143 144 145

This document is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
"BARECON 89" Standard Bareboat Charter

(b) The Charterers shall at their own expense and by their own procurement 146
man, victual, navigate, operate, supply, fuel and repair the Vessel whenever 147
required during the Charter period and they shall pay all charges and 148
expenses of every kind and nature whatsoever incidental to their use and 149
operation of the Vessel under this Charter, including any foreign general 150
municipality and/or state taxes. The Master, officers and crew of the Vessel 151
shall be the servants of the Charterers for all purposes whatsoever, even if for 152
any reason appointed by the Owners. 153
Charterers shall comply with the regulations regarding officers and crew in 154
force in the country of the Vessel's flag or any other applicable law 155
(c) During the currency of this Charter, the Vessel shall retain her present 156
name as indicated in Box 5 and shall remain under and fly the flag as 157
indicated in Box 5. Provided, however, that the Charterers shall have the 158
liberty to paint the Vessel in their own colours, install and display their funnel 159
insignia and fly their own house flag. Painting and re-painting, instalment and 160
re-instalment to be for the Charterers' account and time used thereby to 161
count as time on hire. 162
(d) The Charterers shall make no structural changes in the Vessel or changes 163
in the machinery, boilers, appurtenances or spare parts thereof without in 164
each instance first securing the Owners' approval thereof. If the Owners so 165
agree, the Charterers shall, if the Owners so require, restore the Vessel to its 166
former condition before the termination of the Charter. 167
(e) The Charterers shall have the use of all outfit, equipment, and appliances 168
on board the Vessel at the time of delivery, provided the same or their 169
substantial equivalent shall be returned to the Owners on redelivery in the 170
same good order and condition as when received, ordinary wear and tear 171
excepted. The Charterers shall from time to time during the Charter period 172
replace such items of equipment as shall be so damaged or worn as to be 173
unfit for use. The Charterers are to procure that all repairs to or replacement 174
of any damaged, worn or lost parts or equipment be effected in such manner 175
(both as regards workmanship and quality of materials) as not to diminish the 176
value of the Vessel. The Charterers have the right to fit additional equipment 177
at their expense and risk but the Charterers shall remove such equipment at 178
the end of the period if requested by the Owners. 179
Any equipment including radio equipment on hire on the Vessel at time of 180
delivery shall be kept and maintained by the Charterers and the Charterers 181
shall assume the obligations and liabilities of the Owners under any lease 182
contracts in connection therewith and shall reimburse the Owners for all 183
expenses incurred in connection therewith, also for any new equipment 184
required in order to comply with radio regulations. 185
(f) The Charterers shall dry-dock the Vessel and clean and paint her 186
underwater parts whenever the same may be necessary, but not less than 187
once in every eighteen calendar months after delivery unless otherwise 188
agreed in Box 18. 189

10. Hire 190
(a) The Charterers shall pay to the Owners for the hire of the Vessel at the 191
lump sum per calendar day-month as indicated in Box 21 and Clause 36 192
commencing on and

from the date and hour of her delivery to the Charterers and at and after the 193
agreed lump sum for any part of a month. Hire to continue until the date and 194
hour when the Vessel is redelivered by the Charterers to her Owners. 195
(b) Payment of Hire, except for the first and last month's Hire, if sub-clause (c) 196
of this Clause is applicable, shall be made in cash without discount every 197
month in advance on the first day of each month in the currency and in the 198
Manner and such place as indicated in ~~Box 28~~ Clauses 35, 36 and 38 ~~and at~~ 199
~~the place mentioned in Box 24.~~
(c) Payment of Hire for the first and last month's Hire if less than a full month 200
shall be calculated proportionally according to the number of days in the 201
particular calendar month and advance payment to be effected accordingly. 202
(d) Should the Vessel be lost or missing, Hire to cease from the date and time 203
when she was lost or last heard of. Any Hire paid in advance to be adjusted 204
accordingly. 205
(e) Time shall be of the essence in relation to payment of Hire hereunder. In 206
default of payment beyond a period of seventive running days, the Owners 207
shall

have the right to withdraw the Vessel from the service of the Charterers 208
without noting any protest and without interference by any court or any other 209
formality whatsoever, and shall, without prejudice to any other claim the 210
Owners may otherwise have against the Charterers under the Charter, be 211
entitled to damages in respect of all costs and losses incurred as a result of 212
the Charterers' default and the ensuing withdrawal of the Vessel. 213
(f) Any delay in payment of Hire shall entitle the Owners to an interest as per 214
Clause 38 ~~at the~~
~~rate per annum as agreed in Box 22. If Box 22 has not been filled in the current~~ 215
~~market rate in the country where the Owners have their Principal Place of~~ 216

~~Business shall apply.~~ 217

11. Mortgage See Clause 43 218
~~*) (a) Owners warrant that they have not effected any mortgage of the Vessel.~~ 219
~~*) (b) The Vessel chartered under this Charter is financed by a mortgage~~ 220
~~according to the Deed(s) of Covenant annexed to this Charter and as stated in~~ 221
~~Box 25. By their counter-signature on the Deed(s) of Covenant, the~~ 222
~~Charterers undertake to have co-guaranteed themselves with all terms,~~ 223
~~conditions and provisions of the said Deed(s) of Covenant. The Charterers~~ 224
~~undertake that they will comply with all such instructions or directions in~~ 225
~~regard to the employment, insurances, repairs and maintenance of the~~ 226
~~Vessel, etc., as laid down in the Deed(s) of Covenant or as may be directed~~ 227
~~from time to time during the currency of the Charter by the Mortgagee(s) in~~ 228
~~conformity with the Deed(s) of Covenant.~~ 229
~~(c) The Owners warrant that they have not effected any mortgage(s) other~~ 230
~~than stated in Box 26 and that they will not effect any other mortgage(s)~~ 231
~~without the prior consent of the Charterers.~~ 232
*) (Optional Clauses 11 (a) and 11 (b) are alternatives; indicate alternative agreed 233
in Box 26). 234

12. Insurance and Repairs 235
(a) During the Charter period the Vessel shall be kept insured by the 236
Charterers at their expense against marine, war, Loss of hire, and Protection 237
and Indemnity
Risks and such other risks as the Mortgagee may from time to time 238
require in such form as the Owners shall in writing approve, which approval
shall not be unreasonably withheld. Such marine, war, loss of hire and P. and 239
I.
insurances shall be arranged by the Charterers to protect the interests of both 240
the Owners and the Charterers and mortgagees (if any), and the Charterers 241
shall be at liberty to protect under such insurances the interests of any 242
managers they may appoint. All insurance policies shall be in the joint names 243
of the Owners and the Charterers as their interests may appear. 244
If the Charterers fail to arrange and keep any of the insurances provided 245
for under the provisions of sub-clause (a) above in the manner described 246
therein, the Owners shall notify the Charterers whereupon the Charterers 247
shall rectify the position within seven running days, failing which Owners 248
shall have the right to withdraw the Vessel from the service of the Charterers 249
without prejudice to any claim the Owners may otherwise have against the 250
Charterers. 251
The Charterers shall, subject to the approval of the Owners and the 252
Underwriters, effect all insured repairs and shall undertake settlement of all 253
costs in connection with such repairs as well as insured charges, expenses 254
and liabilities (reimbursement to be secured by the Charterers from the 255
Underwriters) to the extent of coverage under the insurances herein provided 256
for. 257
The Charterers also to remain responsible for and to effect repairs and 258
settlement of costs and expenses incurred thereby in respect of all other 259
repairs not covered by the insurances and/or not exceeding any possible 260
franchise(s) or deductibles provided for in the insurances. 261
All time used for repairs under the provisions of sub-clause (a) of this Clause 262
and for repairs of latent defects according to Clause 2 above including any 263
deviation shall count as time on hire and shall form part of the Charter period. 264
(b) If the conditions of the above insurances permit additional insurance to be 265
placed by the parties, such cover shall be limited to the amount for each party 266
set out in Box 29 and Box 29, respectively. The Owners or the Charterers as 267
the case may be shall immediately furnish the other party with particulars of 268
any additional insurance effected, including copies of any cover notes or 269
policies and the written consent of the insurers of any such required 270
insurance in any case where the consent of such insurers is necessary. 271
(c) Should the Vessel become an actual, constructive, compromised or 272
agreed total loss under the insurances required under sub-clause (a) of 273
Clause 12, all insurance payments for such loss shall be paid to the Mort- 274
gagee, if any, in the manner described in the Deed(s) of Covenant, who shall 275
distribute the moneys between themselves, the Owners and the Charterers 276
according to their respective interests. The Charterers undertake to notify the 277
Owners and the Mortgagee, if any, of any occurrences in consequence of 278
which the Vessel is likely to become a Total Loss as defined in this Clause. 279
(d) If the Vessel becomes an actual, constructive, compromised or agreed 280
total loss under the insurances arranged by the Charterers in accordance 281
with sub-clause (a) of this Clause, this Charter shall terminate as of the date of 282
such loss. 283
(e) The Owners shall upon the request of the Charterers, promptly execute 284
such documents as may be required to enable the Charterers to abandon the 285
Vessel to insurers and claim a constructive total loss. 286
(f) For the purpose of insurance coverage against marine and war risks under 287
the provisions of sub-clause (a) of this Clause, the value of the Vessel is the 288



PART II
"BARECON 89" Standard Bareboat Charter

sum indicated in ~~Box 27~~ 289

**13. Insurance, Repairs and Classification** 290
~~(Optional, only to apply if expressly agreed and stated in Box 27, in which event~~ 291
~~Clause 12 shall be considered deleted).~~ 292
~~(a) During the Charter period the Vessel shall be kept insured by the Owners~~ 293
~~at their expense against marine and war risks under the form of policy or~~ 294
~~policies attached hereto. The Owners and/or insurers shall not have any right~~ 295
~~of recovery or subrogation against the Charterers on account of loss of or any~~ 296
~~damage to the Vessel or her machinery or appurtenances covered by such~~ 297
~~insurance, or on account of payments made to discharge claims against or~~ 298
~~liabilities of the Vessel or the Owners covered by such insurance. All~~ 299
~~insurance policies shall be in the joint names of the Owners and the~~ 300
~~Charterers as their interests may appear.~~ 301
~~(b) During the Charter period the Vessel shall be kept insured by the~~ 302
~~Charterers at their expense against Protection and Indemnity risks in such~~ 303
~~form as the Owners shall in writing approve which approval shall not be~~ 304
~~unreasonably withheld. If the Charterers fail to arrange and keep any of the~~ 305
~~insurances provided for under the provisions of sub-clause (b) in the manner~~ 306
~~described therein, the Owners shall notify the Charterers whereupon the~~ 307
~~Charterers shall rectify the position within seven running days, failing which~~ 308
~~the Owners shall have the right to withdraw the Vessel from the service of the~~ 309
~~Charterers without prejudice to any claim the Owners may otherwise have~~ 310
~~against the Charterers.~~ 311
~~(c) In the event that any act or negligence of the Charterers shall vitiate any of~~ 312
~~the insurance herein provided, the Charterers shall pay to the Owners all~~ 313
~~losses and indemnify the Owners against all claims and demands which~~ 314
~~would otherwise have been covered by such insurance.~~ 315
~~(d) The Charterers shall, subject to the approval of the Owners or Owners'~~ 316
~~Underwriters, effect all insured repairs, and the Charterers shall undertake~~ 317
~~settlement of all miscellaneous expenses in connection with such repairs at~~ 318
~~well as all insured charges, expenses and liabilities, to the extent of coverage~~ 319
~~under the insurances provided for under the provisions of sub-clause (a) of~~ 320
~~this Clause. The Charterers to be secured reimbursement through the~~ 321
~~Owners' Underwriters for such expenditures upon presentation of accounts.~~ 322
~~(e) The Charterers to remain responsible for and to effect repairs and~~ 323
~~settlement of costs and expenses incurred thereby in respect of all other~~ 324
~~repairs not covered by the insurances and/or not exceeding any possible~~ 325
~~franchise(s) or deductibles provided for in the insurances.~~ 326
~~(f) All time used for repairs under the provisions of sub-clause (d) and (e) of~~ 327
~~this Clause and for repairs of latent defects according to Clause 2 above,~~ 328
~~including any deviation, shall count as time on hire and shall form part of the~~ 329
~~Charter period.~~ 330
~~The Owners shall not be responsible for any expenses as are incident to the~~ 331
~~use and operation of the Vessel for such time as may be required to make~~ 332
~~such repairs.~~ 333
~~(g) If the conditions of the above insurances permit additional insurance to be~~ 334
~~placed by the parties such cover shall be limited to the amount for each party~~ 335
~~set out in Box 28 and Box 29, respectively. The Owners or the Charterers as~~ 336
~~the case may be shall immediately furnish the other party with particulars of~~ 337
~~any additional insurance effected, including copies of any cover notes or~~ 338
~~policies and the written consent of the Insurers of any such required~~ 339
~~insurance in any case where the consent of such Insurers is necessary.~~ 340
~~(h) Should the Vessel become an actual, constructive, compromised or~~ 341
~~agreed total loss under the insurances required under sub-clause (a) of this~~ 342
~~Clause, all insurance payments for such loss shall be paid to the Owners, who~~ 343
~~shall distribute the moneys between themselves and the Charterers~~ 344
~~according to their respective interests.~~ 345
~~(i) If the Vessel becomes an actual, constructive, compromised or agreed~~ 346
~~total loss under the insurances arranged by the Owners in accordance with~~ 347
~~sub-clause (a) of this Clause, this Charter shall terminate as of the date of~~ 348
~~such loss.~~ 349
~~(j) The Charterers shall upon the request of the Owners, promptly execute~~ 350
~~such documents as may be required to enable the Owners to abandon the~~ 351
~~Vessel to Insurers and claim a constructive total loss.~~ 352
~~(k) For the purpose of insurance coverage against marine and war risks under~~ 353
~~the provisions of sub-clause (a) of this Clause, the value of the Vessel is the~~ 354
~~sum indicated in Box 27.~~ 355
~~(l) Notwithstanding anything contained in Clause 9 (a), it is agreed that under~~ 356
~~the provisions of Clause 13, if applicable, the Owners shall keep the Vessel~~ 357
~~with unexpired classification in force at all times during the Charter period.~~ 358

**14. Redelivery** See also Clause 53 359
The Charterers shall at the expiration of the Charter period redeliver the 360
Vessel at a safe and ice-free port or place as indicated in ~~Box 16~~. The 361
Charterers shall give the Owners not less than 30 running days' preliminary 362
and not less than 14 days' definite notice of expected date, range of ports of 363
redelivery or port or place of redelivery. Any changes thereafter in Vessel's 364
position shall be notified immediately to the Owners. 365

Should the Vessel be ordered on a voyage by which the Charter period may 366
be exceeded the Charterers (subject as stated in Clause 37 (c)) to have the 367
use of the Vessel to enable them to 368
complete the voyage, provided it could be reasonably calculated that the 368
voyage would allow redelivery about the time fixed for the termination of the 369
Charter. 370
The Vessel shall be redelivered to the Owners in the same or as good 371
structure, state, condition and class as that in which she was delivered, fair 372
wear and tear not affecting class excepted. 373
The Vessel upon redelivery shall have her survey cycles up to date and class 374
certificates valid for at least the number of months agreed in ~~Box 12~~ and 375
Clause53. 

**15. Non-Lien and Indemnity** 376
The Charterers will not suffer, nor permit to be continued, any lien or 377
encumbrance incurred by them or their agents, which might have priority over 378
the title and interest of the Owners and/or their mortgagees in the 379
Vessel.
The Charterers further agree to fasten to the Vessel in the Master's office and 380
on the navigation bridge, ~~a conspicuous place~~ 
and to keep so fastened during the Charter period a notice reading as 381
follows: - 382
"This Vessel is the property of (name of Owners). It is under charter to (name 383
of Charterers) and by the terms of the Charter Party neither the Charterers nor 384
the Master have any right, power or authority to create, incur or permit to be 385
imposed on the Vessel any lien whatsoever." 386
The Charterers shall indemnify and hold the Owners harmless against any 387
lien of whatsoever nature arising upon the Vessel (except any mortgages, 388
liens, encumbrances or claim placed upon the Vessel as a result of Owner's
actions) during the Charter period
while she is under the control of the Charterers, and against any claims 389
against the Owners arising out of or in relation to the operation of the Vessel 390
by the Charterers. Should the Vessel be arrested by reason of claims or liens 391
arising out of her operation hereunder by the Charterers, the Charterers shall 392
at their own expense take all reasonable steps to secure that within a 393
reasonable time the Vessel is released and at their own expense put up bail to 394
secure release of the Vessel. 395

**16. Lien** 396
The Owners to have a lien upon all cargoes and sub-freights belonging to the 397
Charterers and any Bill of Lading freight for all claims under this Charter, and 398
the Charterers to have a lien on the Vessel for all moneys paid in advance and 399
not earned. 400

**17. Salvage** 401
All salvage and towage performed by the Vessel shall be for the Charterers' 402
benefit and the cost of repairing damage occasioned thereby shall be borne 403
by the Charterers. 404

**18. Wreck Removal** 405
In the event of the Vessel becoming a wreck or obstruction to navigation the 406
Charterers shall indemnify the Owners against any sums whatsoever which 407
the Owners shall become liable to pay and shall pay in consequence of the 408
Vessel becoming a wreck or obstruction to navigation. 409

**19. General Average** 410
General Average, if any, shall be adjusted according to the York-Antwerp 411
Rules 1974 or any subsequent modification thereof current at the time of the 412
casualty. 413
The Charter Hire not to contribute to General Average. 414

**20. Assignment and Sub-Demise** 415
The Charterers shall not assign this Charter nor sub-demise the Vessel 416
except with the prior consent in writing of the Owners which shall not be 417
unreasonably withheld and subject to such terms and conditions as the 418
Owners shall approve. Charterers always to remain ultimately responsible 419
for obligations under this Charter.

**21. Bills of Lading** 420
The Charterers are to procure that all Bills of Lading issued for carriage of 421
goods under this Charter shall contain a Paramount Clause incorporating any 422
legislation relating to Carrier's liability for cargo compulsorily applicable in 423
the trade; if no such legislation exists, the Bills of Lading shall incorporate the 424
British Carriage of Goods by Sea Act. The Bills of Lading shall also contain the 425
amended New Jason Clause and the Both-to-Blame Collision Clause. 426
The Charterers agree to indemnify the Owners against all consequences or 427
liabilities arising from the Master, officers or agents signing Bills of Lading or 428
other documents. 429

**22. Bank Guarantee** 430
The Charterers undertake to furnish, before delivery of the Vessel, a first class 431

This text is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




PART II
"BARECON 89" Standard Bareboat Charter

~~bank guarantee or bond in the sum and at the place as indicated in Box 26 as~~ 432
~~guarantee for full performance of thou obligations under this Charter.~~ 433
~~(Optional, only to apply if Box 25 filed in).~~ 434

**23.  Requisition/Acquisition** 435
(a) In the event of the Requisition for Hire of the Vessel by any governmental or 436
other competent authority (hereinafter referred to as "Requisition for Hire") 437
irrespective of the date during the Charter period when "Requisition for Hire" 438
may occur and irrespective of the length thereof and whether or not it be for 439
an indefinite or a limited period of time, and irrespective of whether it may or 440
will remain in force for the remainder of the Charter period, this Charter shall 441
not be deemed thereby or thereupon to be frustrated or otherwise terminated 442
and the Charterers shall continue to pay the stipulated hire in the manner 443
provided by this Charter until the time when the Charter would have 444
terminated pursuant to any of the provisions hereof always provided however 445
that in the event of "Requisition for Hire" any Requisition Hire or 446
compensation received or receivable by the Owners shall be payable to the 447
Charterers during the remainder of the Charter period or the period of the 448
"Requisition for Hire" whichever be the shorter. 449
The Hire under this Charter shall be payable to the Owners from the same time 450
as the Requisition Hire is payable to the Charterers. 451
(b) In the event of the Owners being deprived of their ownership in the Vessel 452
by any Compulsory Acquisition of the Vessel or requisition for title by any 453
governmental or other competent authority (hereinafter referred to as 454
"Compulsory Acquisition"), then, irrespective of the date during the Charter 455
period when "Compulsory Acquisition" may occur, this Charter shall be 456
deemed terminated as of the date of such "Compulsory Acquisition". In such 457
event Charter Hire to be considered as earned and to be paid up to the date 458
and time of such "Compulsory Acquisition". 459

**24.  War** 460
(a) The Vessel not to enter a war risk area/zone as designated by the 461
Institute of London Underwriters  unless the consent of the Owners be first
obtained, which shall not be unreasonably withheld, provided proper war risk
insurance has been obtained at Charterers' risk and expense not to be
ordered nor continue to any place or on any voyage nor be used on any 462
service which will bring her within a zone which is dangerous as the result of 463
any actual or threatened act of war, war, hostilities, warlike operations, acts of 464
piracy or of hostility or malicious damage against this or any other vessel or 465
its cargo by any person, body or State whatsoever, revolution, civil war, civil 466
commotion or the operation of international law, nor be exposed in any way to 467
any risks or penalties whatsoever consequent upon the imposition of 468
Sanctions, nor carry any goods that may in any way expose her to any risks of 469
seizure, capture, penalties or any other interference of any kind whatsoever 470
by the belligerent or fighting powers or parties or by any Government or Ruler. 471
(b) The Vessel to have liberty to comply with any orders or directions as to 472
departure, arrival, routes, ports of call, stoppages, destination, delivery or in 473
any other wise whatsoever given by the Government of the nation under 474
whose flag the Vessel sails or any other Government or any person (or body) 475
acting or purporting to act with the authority of such Government or by any 476

committee or person having under the terms of the war risks insurance on the 477
Vessel the right to give any such orders or directions. 478
(c) In the event of outbreak of war (whether there be a declaration of war or 479
not) between any two or more of the countries as stated in Box 31, both the 480
Owners and the Charterers shall have the right to cancel this Charter, 481
whereupon the Charterers shall redeliver the Vessel to the Owners in 482
accordance with Clause 14, if she has cargo on board after discharge thereof 483
at destination, or if detained under this Clause then reaching or entering it at 484
a near open and safe port as directed by the Owners, or if she has no cargo on 485
board, at the port at which she then is or if at sea at a near open and safe port 486
as directed by the Owners. In all cases hire shall continue to be paid in 487
accordance with Clause 10 and except as aforesaid all other provisions of this 488
Charter shall apply until redelivery. 489

**25.  Commission** 490
~~The Owners to pay a commission at the rate indicated in Box 32 to the Brokers~~ 491
~~named in Box 32 on any Hire paid under the Charter but in no case less than is~~ 492
~~necessary to cover the actual expenses of the Brokers and a reasonable fee~~ 493
~~for their work. If the full Hire is not paid owing to breach of Charter by either of~~ 494
~~the parties the party liable therefor to indemnify the Brokers against their loss~~ 495
~~of commission.~~ 496
~~Should the parties agree to cancel the Charter, the Owners to indemnify the~~ 497
~~Brokers against any loss of commission but in such case the commission not~~ 498
~~to exceed the brokerage on one year's Hire.~~ 499

**26.  Law and Arbitration** 500
~~*)  26.1  This Charter shall be governed by English law and any dispute arising~~ 501
~~out of this Charter shall be referred to arbitration in London, one arbitrator~~ 502
~~being appointed by each party. In accordance with the Arbitration Acts 1950~~ 503
~~and 1979 or any statutory modification or re-enactment thereof for the time~~ 504
~~being in force. On the receipt by one party of the nomination in writing of the~~ 505
~~other party's arbitrator, that party shall appoint their arbitrator within fourteen~~ 506
~~days, failing which the decision of the single Arbitrator appointed shall apply.~~ 507
~~If two Arbitrators properly appointed shall not agree they shall appoint an~~ 508
~~umpire whose decision shall be final.~~ 509
~~*)  26.2  Should any dispute arise out of this Charter, the matter in dispute shall~~ 510
~~be referred to three persons at New York, one to be appointed by each of the~~ 511
~~parties hereto, and the third by the two so chosen, their decision or that of any~~ 512
~~two of them shall be final, and for purpose of enforcing any award, this~~ 513
~~agreement may be made a rule of the Court.~~ 514
~~The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of~~ 515
~~New York and the proceedings shall be conducted in accordance with the~~ 516
~~rules of this Society.~~ 517
~~*)  26.3  Any dispute arising out of this Charter shall be referred to arbitration at~~ 518
~~the place indicated in Box 33, subject to the law and procedures applicable~~ 519
~~there.~~ 520
~~26.4  If Box 33 in Part I is not filled in, sub-clause 26.1 of this Clause shall~~ 521
~~apply.~~ 522
~~*)  26.1, 26.2, and 26.3, are alternatives; indicate alternative agreed in Box 33.~~ 523

This document is a computer generated BARECON 89 form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-
printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of
discrepancies between the original BIMCO approved document and this computer generated document.



"BARECON 89" Standard Bareboat Charter

OPTIONAL
PART

## PART III
### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
(Optional, only to apply if expressly agreed and stated in Box 35)

**Specifications and Building Contract**

(a) The Vessel shall be constructed in accordance with the Building Contract 1
(hereafter called "the Building Contract") as annexed to this Charter, made 2
between the Builders and the Owners and in accordance with the specifications 3
and plans annexed thereto, such Building Contract, specifications and plans 4
having been counter-signed as approved by the Charterers. 5
(b) No change shall be made in the Building Contract or in the specifications or 6
plans of the Vessel as approved by the Charterers as aforesaid, without the 7
Charterers' consent 8
(c) The Charterers shall have the right to send their representative to the Builders' 9
Yard to inspect the Vessel during the course of her construction to satisfy 10
themselves that construction is in accordance with such approved specifications 11
and plans as referred to under sub-clause (a) of this Clause 12
(d) The Vessel shall be built in accordance with the Building Contract and shall be 13
of the description set out therein provided nevertheless that the Charterers shall 14
be bound to accept the Vessel from the Owners on the date of delivery by the 15
Builders as having been completed and constructed in accordance with the 16
Building Contract and the Charterers undertake that after having so accepted the 17
Vessel they will not thereafter raise any claims against the Owners in respect of 18
the Vessel's performance or specification or defects if any except that in respect 19
of any repair or replacement of any defects which appear within the first 12 20
months from delivery the Owners shall use their best endeavours to recover any 21
expenditure incurred in remedying such defects from the Builders, but shall only 22
be liable to the Charterers to the extent the Owners have a valid claim against the 23
Builders under the guarantee clause of the Building Contract (a copy whereof has 24
been supplied to the Charterers) provided that the Charterers shall be bound to 25
accept such sums as the Owners are able to recover under this clause and shall 26
make no claim upon the Owners for any difference between the amounts so 27
recovered and the actual expenditure incurred on repairs or replacements or for 28
any loss of time incurred thereby. 29
30

**Time and Place of Delivery**

(a) Subject to the Vessel having completed her acceptance trials including trials 31
of cargo equipment in accordance with the Building Contract and specifications 32
to the satisfaction of the Charterers, the Owners shall give and the Charterers 33
shall take delivery of the Vessel afloat when ready for delivery and the Charterers 34
or some other safe and readily accessible dock, wharf or place as may be agreed 35
between the parties hereto and the Builders. Under the Building Contract the 36
Builders have estimated that the Vessel will be ready for delivery to the Owners as 37
therein provided but the delivery date for the purpose of this Charter shall be the 38
date when the Vessel is in fact ready for delivery by the Builders after completion 39
of trials whether that be before or after as indicated in the Building Contract. 40
Notwithstanding the foregoing, the Charterers shall not be obliged to take delivery 41
of the Vessel until she has been classed and documented as provided in this 42
Charter and free for transfer to the flag she has to fly. Subject as aforesaid the 43
Charterers shall not be entitled to refuse acceptance of delivery of the Vessel and 44
upon and after such acceptance the Charterers shall not be entitled to make any 45
claim against the Owners in respect of any conditions, representations or 46
47

warranties, whether express or implied, as to the seaworthiness of the Vessel or in 48
respect of delay in delivery or otherwise howsoever. 49
(b) If for any reason other than a default by the Owners under the Building 50
Contract, the Builders become entitled under that Contract not to deliver the 51
Vessel to the Owners, the Owners shall upon giving to the Charterers written 52
notice of Builders becoming so entitled, be excused from giving delivery of the 53
Vessel to the Charterers and upon receipt of such notice by the Charterers this 54
Charter shall cease to have effect. 55
(c) If for any reason the Owners become entitled under the Building Contract to 56
reject the Vessel the Owners shall, before exercising such right of rejection, 57
consult the Charterers and thereupon 58
i)    if the Charterers do not wish to take delivery of the vessel they shall inform the 59
——Owners within seven (7) days by notice in writing and upon receipt by the 60
——Owners of such notice this Charter shall cease to have effect; or 61
ii)   if the Charterers wish to take delivery of the Vessel they may by notice in 62
——writing within seven (7) days require the Owners to negotiate with the Builders 63
——as to the terms on which delivery should be taken and/or refrain from 64
——exercising their right to rejection and upon receipt of such notice the Owners 65
——shall commence such negotiations and/or take delivery of the Vessel from the 66
——Builders and deliver her to the Charterers; 67
iii)  in no circumstances shall the Charterers be entitled to reject the Vessel 68
——unless the Owners are able to reject the Vessel from the Builders; 69
iv)   if this Charter terminates under sub-clause (b) or (c) of this Clause, the 70
——Owners shall thereafter not be liable to the Charterers for any claim under or 71
——arising out of this Charter or its termination. 72

**Guarantee Works**

If not otherwise agreed, the Owners authorize the Charterers to arrange for the 73
guarantee works to be performed in accordance with the building contract terms 74
and hire to continue during the period of guarantee works. The Charterers have to 75
advise the Owners about the performance to the extent the Owners may request. 76
77

**Name of Vessel**

The name of the Vessel shall be mutually agreed between the Owners and the 78
Charterers and the Vessel shall be painted in the colours, display the funnel 79
insignia and fly the house flag as required by the Charterers. 80
81

**Survey on Redelivery**

The Owners and the Charterers shall appoint surveyors for the purpose of 82
determining and agreeing in writing the condition of the Vessel at the time of re- 83
delivery. 84
85
Without prejudice to Clause 14 (Part II) the Charterers shall bear all survey 86
expenses and all other costs, if any, including the cost of docking and undocking, 87
if required, as well as all repair costs incurred. 88
The Charterers shall also bear all loss of time spent in connection with any 89
docking and undocking as well as repairs, which shall be paid at the rate of Hire 90
per day or pro rata. 91

This document is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"BARECON 89" Standard Bareboat Charter

**PART IV**
**HIRE/PURCHASE AGREEMENT**
(Optional, only to apply if expressly agreed and stated in Box 39)

On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed that on payment of the last month's hire instalment as per Clause 10 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for. (1-5)

If the payment of the instalment due is delayed for less than 7 running days or for reason beyond the Charterers' control, the right of withdrawal under the terms of Clause 10(e) of Part II shall not be exercised. However, any delay in payment of the instalment due shall entitle the Owners to an interest at the rate per annum as agreed in Box 22. If Box 22 has not been filled in the current market rate in the country where the Owners have their Principal Place of Business shall apply. (6-11)

*In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.* (12-13)

The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter. (14-15)

The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected (16-23)

with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account. (24-26)

In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers. (27-31)

The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession. (32-34)

The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment. (35-36)

The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of the Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description. (37-41)

The Buyers undertake to pay for the repatriation of the Captain, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 2 (Part II) or to pay the equivalent cost for their journey to any other place. (42-45)

This document is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## "BARECON 89" Standard Bareboat Charter

### PART V
### PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY
(Optional, only to apply if expressly agreed and stated in Box 40)

**Definitions**    1
For the purpose of this PART V, the following terms shall have the meanings    2
hereby assigned to them.    3
"The Bareboat Charter Registry" shall mean the registry of the State whose flag    4
the Vessel will fly and in which the Charterers are registered as the bareboat    5
charterers during the period of the Bareboat Charter.    6
"The Underlying Registry" shall mean the registry of the State in which the Owners    7
of the Vessel are registered as Owners and to which jurisdiction and control of the    8
Vessel will revert upon termination of the Bareboat Charter Registration.    9

**Mortgage**    10
The Vessel chartered under this Charter is financed by a mortgage and the    11

provisions of Clause 11 (b) (Part II) shall apply.    12

**Termination of Charter by Default**    13
If the Vessel chartered under this Charter is registered in a Bareboat Charter    14
Registry as stated in Box 41, and if the Owners shall default in the payment of any    15
amounts due under the mortgage(s) specified in Box 28, the Charterers shall, if so    16
required by the mortgagee, direct the Owners to re-register the Vessel in the    17
Underlying Registry as shown in Box 42.    18
In the event of the Vessel being deleted from the Bareboat Charter Registry as    19
stated in Box 41, due to a default by the Owners in the payment of any amounts due    20
under the mortgage(s), the Charterers shall have the right to terminate this    21
Charter forthwith and without prejudice to any other claim they may have against    22
the Owners under this Charter.    23

This document is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



# Riders "Rachel B"

## ADDITIONAL CLAUSES
Nos. 32-56
(clauses 27 - 31 intentionally left out)

### 32. RELATED CONTRACTS

The Owners have entered into an agreement (the "MoA") of even date herewith for the purchase of the Vessel from Suffolk Tankers Ltd. of Monrovia, Liberia (the "Sellers").

Further, the Owners have entered into a contract (the "Martha A MoA") with Cambria Tankers Ltd of Monrovia, Liberia (the "Martha A Sellers") for the purchase of MV "Martha A", and further, the Owners have entered into a contract (the "Martha A Charter") with the Charterers for the chartering of MV "Martha A" to Charterers on such terms and conditions as are set out in more detail in the Martha A Charter.

The Sellers, the Martha A Sellers, the Charterers, the General Partner (as hereinafter defined) and Mr Carl G Hiltveit, have entered into an Undertaking (the "Undertaking") of even date herewith with the Owners, regarding i.a. application of sales proceeds, non-competition, restrictions on dividends etc.

(The MoA, the Martha A Moa, the Martha A Charter and the Undertaking are hereinafter referred to as the "Related Contracts").

### 33. MOA AND DELIVERY

(a) The Owners' obligations to charter the Vessel to the Charterers hereunder are conditional upon concurrently (i) the Vessel being delivered to the Owners by the Sellers under the MoA, (ii) the Martha A being delivered by the Martha A Sellers to the Owners under the Martha A MoA, and (iii) Martha A being accepted and taken over by the Charterers under the Martha A Charter. If, for any reason whatsoever, the Vessel is not delivered by the Sellers under the MoA, or Martha A is not delivered or taken over under the Martha A MoA or Martha A is not delivered or taken over under the Martha A Charter, then this Charter shall be considered null and void.

(b) Subject to the Vessel being delivered to, and taken over by, the Owners, pursuant to the MoA, the Charterers shall forthwith be deemed to have taken delivery of the Vessel under this Charter simultaneously with its delivery by the Sellers to the Owners pursuant to the MoA. The date of delivery for the purpose of this Charter shall be the date (the "Delivery Date") when the Vessel is in fact delivered by the Sellers to the Owners pursuant to the MoA, whether that be before or after the scheduled date therefore under the MoA, and the Owners shall be under no responsibility for any delay whatsoever in delivery of the Vessel to the Charterers under this Charter. On the Delivery Date the Owners and the Charterers shall sign a Protocol of Delivery and Acceptance evidencing delivery of the Vessel hereunder.

(c) The inspection carried out by Marinco on behalf of Owners on 1st December 2003 in connection with Owners' purchase of the Vessel from the Sellers, shall constitute the On-hire survey referred to i.a. in Clauses 6 and 33 (f). Charterers acknowledge having received a copy of the Survey report by Marinco (and which, together with such additional documentation as referred to in this charter, including documentation referred to in Clause 39, shall constitute the On-hire survey documentation).

(d)

   (i)     Subject to Clause 33 (d) (iii) hereof, the Charterers acknowledge and agree that the Owners make no condition, term, representation or warranty, express or implied (and whether statutory or otherwise) as to title (except for legal title is in the name of the Owners free of registered encumbrances other than the mortgages referred to in Clause 43 hereof), seaworthiness, merchantability, condition, design, operation, performance, capacity or fitness for use of the Vessel or as to the eligibility of the Vessel for any particular trade or operation or any other condition, term, representation or warranty whatsoever, express or implied, with respect to the Vessel. Delivery to and acceptance by the Charterers of (as the case may be) deemed delivery of the Vessel under this Charter shall be conclusive proof that, for the purpose of the obligations and liabilities of the Owners hereunder or in connection herewith, the Vessel is at the time seaworthy, in accordance with the provisions of this Charter, in good working order and repair and without defect or inherent vice whether or not discoverable by the Charterers and free and clear of all encumbrances, mortgages, charges, liens or security interests whatsoever, save for the mortgage referred to in Clause 43 hereof (other than any such arising from or in connection with the use or operation of the Vessel by the Charterers or any permitted sub-charterers).

   (ii)    The Charterers agree that the Owners shall be under no liability to supply any replacement vessel or any piece or part thereof during any period when the Vessel is unusable and shall not be liable to the Charterers or any other person as a result of the Vessel being unusable.

   (iii)   Nothing contained in this sub-clause 33 (d) shall be construed as a waiver of any rights or remedies of the Charterers at law or in equity against the Owners in respect of (A) any fraudulent or wilful misconduct or recklessness of either the Owners under this Charter including their servants or agents or (B) any failure on the part of the Owners to comply with any of the terms of or any misrepresentation of the Owners contained in this Charter.

(e) The obligations of the Owners to charter the Vessel to the Charterers under this Charter are subject to and conditional upon at the Delivery Date;

   (i)     each of the representations and warranties contained in Clause 46 hereof being true and correct in all material respects on the Delivery Date by reference to the facts and circumstances then existing; and

   (ii)    no Termination Event (as defined in Clause 49 hereof) having occurred and continuing unremedied, and no other event having occurred and continuing unremedied, which with giving of notice and/or lapse of time would, if not remedied, constitute a Termination Event;

and

(iii)    the Owners having received evidence that the Vessel is insured in accordance with the provisions of this Charter and that all requirements of Clause 48 hereof in respect of such insurances have been complied with; and

(iv)    the Owners having received evidence that Hiltveit Associates Inc. have been appointed manager for the Vessel (the "Manager") (or that arrangements have been made for such appointment to commence from such date as the Managers shall have agreed); and

(v)    the Owners having received from the Manager a copy of Manger's DOC, and, in respect of the Vessel, the Vessels' Safety Management Certificate; and

(vi)    the Owners having received from the General Partner (as defined in clause 46 (ii)) on its own and on behalf of its shareholders, an undertaking that all present and future COAs and other contracts for cargoes suitable for carriage on the Vessel and arranged by the General Partner (or its shareholders as the case may be) will be channelled through the General Partner, and that the General Partner and its shareholders will not involve themselves in any business in competition with the businesses of the Charterer.

(f) The On-Hire Survey referred to in Clauses 6 and 33 (c) hereof shall be solely for the purposes of ascertaining and documenting the condition of the Vessel at the time of the survey for the purpose of establishing the condition of the Vessel against which the condition upon redelivery as per Clause 53 shall be measured, and shall not give rise to any right of the Owners to refuse to deliver, or the Charterers to refuse to accept, the Vessel hereunder. During the On-Hire Survey by Marinco, certain holds, compartments and parts of the Vessels were not accessible to the surveyors, and it is expressly agreed, that if, and to the extent, any hold, compartment or part of the Vessel were not inspected during the beforementioned On-Hire Survey, such non-inspected areas shall be deemed to be in equal standard and condition as comparable areas inspected. Furthermore, and for the purpose of the On-Hire Survey, the Vessel shall be deemed to have been delivered under this charter with the coating standard of all tanks and holds to a minimum "Fair" category, and any upgrading of the coating of the tanks and holds as per Clause 39 shall be deemed to constitute an integral part hereof and the On-Hire Survey documentation may (upon the repair and upgrading of the relevant tanks and holds) be supplemented by photographs or other suitable documentation to evidence the condition of such items and areas (as the case may be) upon completion of the relevant works for the purposes hereof.

The Charterers shall at the time of delivery take over and pay for all bunkers, lub. oil, water and other consumable stores in the Vessel. Payment shall be made directly to Sellers and Charterers shall discuss and agree price and form and procedure of payment directly with Sellers.

## 34. CHARTER PERIOD

(a) The Owners shall let to the Charterers and the Charterers shall take Rachel B on charter for the period and upon the terms and conditions contained herein.

(b) Subject to the provisions hereof, the period of the chartering of the Vessel hereunder (hereinafter referred to as the "Charter Period") shall comprise (unless terminated at an earlier date in accordance with the terms hereof);

    (i)    an initial period of eight (8) years (the "Initial Period") commencing on the Delivery Date and ending on the 8th anniversary thereof, and

    (ii)    subject to the exercise by the Charterers of one or more of the option periods referred to in Clause 35 hereof, a further period of 5 (five) years commencing on the day immediately following the last day of the Initial Period and terminating on the 13th anniversary of the Delivery Date,

provided always that the chartering of the Vessel hereunder may be terminated by the Owners pursuant to Clause 49 or shall be terminated in the event of a Total Loss or Compulsory Acquisition of the Vessel subject to, and in accordance with the provisions of Clause 48.

## 35. THE CHARTERERS' OPTION TO EXTEND THE CHARTER PERIOD

(a) Subject to Clause 35 (b) below, the Charterer shall be entitled, by giving notice to the Owners not less than six (6) months prior to the expiry of the Initial Period, to extend the Charter Period by five (5) years (the "Extended Period") (which option is hereinafter referred to as the "Charterers' Option"). Such notice once given shall be irrevocable.

(b) The Charterer's right to extend the Charter Period shall be subject to the Charterer simultaneously extending the charter period for MV "Martha A" under the Martha A Charter, according to the terms of the Martha A Charter (unless the Martha A shall have become a Total Loss, a Compulsory Acquisition shall have occurred or the Martha A Charter shall have been mutually terminated by the parties hereto).

## 36. CHARTER HIRE AND EARLY REDELIVERY COMPENSATION

(a) The Charterers shall pay charter hire to the Owners monthly in advance at a rate of USD 4,100 per day (and multiplied with the number of days in the relevant month) during the first two years of the Initial Period and thereafter, throughout the Initial Period, pay charter hire at a rate of USD 4,250 per day (and multiplied with the number of days in the relevant month).

(b) The Charterers shall during the Extended Period, pay charter hire monthly in advance at a rate of USD 3,000 per day (and multiplied with the number of days in the relevant month).

(c) If, for any reason, the Vessel is not redelivered to the Owners on the final day of the Charter Period, the Charterers shall pay for value on such final day of the Charter Period charter hire in an amount equal to the amount paid for the immediately preceding monthly period. Upon redelivery of the Vessel, the Owners shall reimburse to the Charterers an amount computed on the basis of the remaining days (if any) of the relevant month in respect of which the charter



payment has been made as from the relevant redelivery date.

37. PURCHASE OPTION

The Charterers shall, provided that Charterers are not in default under this Charter, have an option to purchase the Vessel at the time and on the terms and conditions as follows:

On the 5th anniversary date of the Delivery Date at a purchase price of USD 4,500,000, or
On the 6th anniversary date of the Delivery Date at a purchase price of USD 3,500,000, or
On the 7th anniversary date of the Delivery Date at a purchase price of USD 2,500,000, or
On the 8th anniversary date of the Delivery Date at a purchase price of USD 1,500,000, or

If Charterers wish to exercise their purchase option, Charterers shall notify the Owners thereof not later than 3 months prior to the relevant anniversary date. Once given such notification shall not be withdrawn.

The Charterers' right to purchase the Vessel according to the above shall be conditional upon the Charterers simultaneously purchasing MV "Martha A" under and on the terms of the Martha A Charter (unless the Martha A shall have become a Total Loss, a Compulsory Acquisition shall have occurred or the Martha A Charter shall have been mutually terminated by the parties hereto).

If Charterers rightfully exercise their option to purchase the Vessel as set out above, the Charterers shall on the relevant anniversary date, take over the Vessel on a strictly "as is where is" basis, and with no responsibility whatsoever for the Owners as to the condition of the Vessel.

The purchase will be on the terms of the Norwegian sale form as annexed to this charter.

38. PAYMENTS

(a) Notwithstanding anything to the contrary contained in this Charter, all payments by the Charterers hereunder (whether by way of hire or otherwise) shall be made as follows;

  (i)    not later than 11.00 a.m. (New York time) on the date on which the relevant payment is due under the terms of this Charter; and

  (ii)   in United States Dollars in funds with the same day to Owner's account number 6019.04.43348 with Nordea Bank Norge ASA (or such other bank or banks as may from time to time be notified by the Owners to the Charterers by not less than ten (10) Banking Days' prior written notice) for the account of the Owners under reference "Rachel B".

(b) If any day for the making of any payment hereunder shall not be a Banking Day (being, for all purposes of this Charter, a day on which banks are open for transaction of business of the nature required by this Charter in Oslo, London and New York City) the due date for payment of the same shall be the next following Banking Day unless, in the case of a payment of hire hereunder, the next following Banking Day falls in the following calendar month, in which case the due date for the

relevant payment of hire shall be the immediately preceding Banking Day in Oslo, London and New York City.

(c) All hire payments and eventual interest payments thereon under this Charter shall be made without any set-off or counterclaim whatsoever and free and clear of any withholding or deduction for, or on account of, any present or future income, freight, stamp and other taxes, levies, imposts, duties, fees, charges, restrictions or conditions of any nature. If the Charterers are required by any authority in any country to make any withholding or deduction from any such payment, the sum due from the Charterers in respect of such payment will be increased to the extent necessary to ensure that, after the making of such withholding or deduction the Owners receive a net sum equal to the amount which it would have received had no such deduction or withholding been required to be made. The Charterers will promptly deliver to the Owners any receipts, certificates or other proof evidencing the amounts (if any) paid or payable, in respect of any such deduction or withholding as aforesaid.

(d) Subject to the terms of this Charter, the Charterer's obligation to pay hire in accordance with the requirements of this Charter and to pay the insurance premiums relating to the Minimum Insured Value pursuant to Clause 48 shall be absolute irrespective of any contingency or cause whatsoever, which would or might, but for this provision have the effect of terminating or in any way affecting any obligation of the Charterers under this Charter. Strictly without prejudice to the foregoing, nothing in Clause 38 (c) and (d) shall be deemed to prejudice any such rights and remedies of the Charterers against the Owners as otherwise described herein.

(e) In the event of failure by the Charterers to pay on the due date for payment thereof, or in the case of a sum payable on demand, the date of demand therefore, any hire or other amount payable by them under this Charter, the Charterers will pay to the Owners on demand interest on such amount from the date of such failure to the date of actual payment (both before and after any relevant judgement or winding-up of the Charterers) at the rate to be the aggregate of (i) Three per centum (3%) and (ii) the London Interbank Offered Rate for US Dollar deposits of one months' duration computed from the relevant due date, as such rate is from time to time quoted by leading banks in the London Interbank Market. Interest payable by the Charterers as aforesaid shall be payable on demand.

(f) Any interest payable under this Charter shall accrue from day to day and shall be calculated on the actual number of days elapsed and a three hundred and sixty (360) day year.

## 39. MAINTENANCE AND OPERATIONS

Notwithstanding anything to the contrary set out in Clause 9 above, the Charterers undertake to maintain the Vessel throughout the Charter Period in accordance with good commercial maintenance practices.

In the inspection report prepared by Marinco following the On-hire survey, it was noted that:

i)      Diesel generator no. 2 out of order due to major breakdown, currently under repair

ii)     Backlog in maintenance at exposed main deck areas with deficiencies to piping as a result of corrosion and wastage

iii)   Main deck pipe systems require adequate arrest of corrosion and wastage without delay and some renewals are to be anticipated

iv)   The cosmetically appearance of the main deck, superstructure and other exposed decks has suffered from frequent North-Atlantic trade, consequently lack of maintenance, and requires overall attention

v)   Some local upgrading of coating at cargo wing tanks is recommended at breakdown areas

vi)   Water ballast tanks generally with a satisfactory coating condition for the age, but scattered localized aggressive corrosion and wastage requires attention and which Norfolk shall attend to and rectify within a reasonable time and at the latest prior to redelivery to Zarepta of the Vessel under the Bareboat Charter in accordance with good commercial maintenance practice.

and Norfolk shall rectify this at its cost and time at the latest prior to the Vessel being redelivered to Zarepta.

Without affecting the generality of the foregoing paragraph, the Charterers specifically undertakes at their own cost and time, in co-operation with Sellers, at the latest before the Vessel is redelivered to the Owners under the Bareboat Charter, to upgrade the coating standard of all tanks and holds to a minimum "Fair" category. All steel renewals to be for the cost and time of the Charterer, and further to repair (or complete repairing) of the above to the reasonable satisfaction of the Owners

### 40. IMPROVEMENT AND ADDITIONS

The Charterers shall have the right to fit additional equipment and to make severable improvements and additions at their expense and risk, provided such additional equipment, improvements and additions may be removed from the Vessel without causing any material damage to the Vessel (any such removal and damage being made good by the Charterers at their time and expense), or the Owners may elect to keep the equipment, free of charge

### 41. WAR CANCELLATION

With reference to Box 31 and to Clause 24 (C) it its understood that War or War Like Operations or Actual Hostilities means direct war or hostilities between 2 or more of these nations directly affecting the performance of this Charter Party and does not include local hostilities or civil war where any of the countries in Box 31 support opposing sides. Neither Charterers nor Owners shall take unreasonable advantage of this clause in order to terminate this Charter Party.

### 42. INDEMNITY

(a) Subject to the terms of this Charter, the Charterers agree at all times to indemnify and keep indemnified the Owners against;

(i)   any costs, charges or expenses which the Charterers have agreed to pay under this Charter

# EXHIBIT A

and which shall be claimed or assessed against or paid in by the Owners; and

(ii)     all losses, costs, charges, expenses, fees, payments, liabilities, penalties, fines, damages or other sanctions of a monetary nature (collectively "Losses") (except for losses due to Owners' default without similar payment default by Charterers) suffered. or incurred by the Owners (acting honestly and in good faith) and arising directly or indirectly in a manner out of the design, manufacture, delivery, nondelivery, purchase, importation, registration, chartering, sub-chartering, possession, control, use, operation, condition, maintenance, repair, replacement, refurbishment, modification, overhaul, insurance, sale or other disposal, return or storage or of loss of or damage to the Vessel or otherwise in connection with the Vessel including any and all claims in tort or in contract by any sub-charterer of the Vessel from the Charterers or the Sellers or by the holders of any Bills of Lading issued by the Charterers or the Sellers, provided always that the indemnity in respect of Losses contained in this sub-clause (ii) shall not extend to any Losses of the Owners as a consequence of the value of the Vessel at the end of the Charter Period unless such Losses shall have resulted from any breach by the Charterers of the terms of this Charter or by the Sellers of the terms of the MoA ; and

(iii)    all Losses suffered or incurred by the Owners in preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of the Vessel, or in securing the release of the Vessel therefrom;

provided always that the Charterers shall be entitled to take, in the name of the Owners, such reasonable action as the Charterers see fit to defend or avoid any Losses or to recover the same from any third party but subject to the Charterers first ensuring that the Owner are indemnified and secured to their satisfaction against all Losses thereby incurred or to be incurred.

(b)  The Charterers shall fully indemnify the Owners against any Losses incurred or suffered by the Owners in liquidating, employing or prepaying funds acquired or borrowed to purchase or finance or refinance the Vessel following any default in payment hereunder or the occurrence of any Termination Event.

(c)  If, under any applicable law, whether as a result of judgement against the Charterers or the liquidation of the Charterers or for any other reason, any payment to be made by the Charterers under or in connection with this Charter is made or is recovered in a currency other than the currency (the "currency of obligation") in which it is payable pursuant to this Charter then, to the extent that the payment (when converted into the currency of obligation at the rate of exchange on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable law) falls short of the amount unpaid under this Charter, the Charterers shall as a separate and independent obligation, fully indemnify the Owners against the amount of the shortfall; and for the purposes of this sub-clause "rate of exchange" means the actual rate at which the Owners are able on the relevant date to purchase the currency of obligation in London with that other currency.

(d)  The indemnities contained in this Clause 42, and each other indemnity contained in this Charter, shall survive any termination or other ending of this Charter and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter.

(e)  Without prejudice to the foregoing provisions of this Clause 42, all costs and expenses arising in connection with the registration of the Vessel in the name of the Owners under the Liberian flag in

the Liberian Ship Register or under the first flag to which the Vessel may be transferred pursuant to Clause 44 (a) hereof, or in connection with the maintenance of such registration or the maintenance of registration of the Vessel under any further flag to which the Vessel may be transferred (provided that, in the latter case, the Charterers shall not be obliged to bear any costs or expense in excess of that applying in relation to the first flag, after Liberian, to which the Vessel may be transferred), shall be born by the Charterers and, if and to the extent from time to time paid by the Owners, shall be reimbursed by the Charterers to the Owners upon demand.

## 43. MORTGAGES

(a) The Charterers agree that the Owners shall be entitled, on or at any time after the Delivery Date, to grant any reputable bank or financial institution and to the Sellers (the "Mortgagees") one or more mortgages on the Vessel, assignment(s) of the earnings and insurances thereof, and assignment(s) of this Charter, all as security for any loan or other facilities arranged by the Owners to finance or re-finance the purchase of the Vessel and the Martha A, subject, however, that (i) there shall be no increase of the amounts secured thereunder, and (ii)          extension of the existing mortgages or any new mortgages beyond the Initial Period shall, unless the Charterers have exercised their rights to extend the Charter Period, require the consent of the Charterer, such consent not to be unreasonably withheld.

(b) Subject always to the compliance by the Owners and the Mortgagees with the provisions of Clause 43 (a) hereof, the Charterers agree with the Owners to acknowledge and agree to be bound by, and to procure that any sub-charterer acknowledges and agrees to be bound by notice of any assignment of this Charter executed in favour of the Mortgagees in the manner described in clause 43 (a) hereof.

## 44. TRANSFER OF VESSEL

(a) Any change in the registered ownership of the Vessel shall, as long as Rachel B is on Charter to the Charterer, require the Charterers' prior approval, which shall be considered by Charterers in good faith.

(b) Upon Owners' sale of the Vessel, any reference to "the Sellers" and the "MoA" shall (except for such reference in Clause 33 (f) be deemed to be deleted herein, and any subsequent owner shall not be entitled to direct any claim against the Sellers or on the basis of the MoA.

(c) The Charterers agree and undertake to enter into any such usual documents as the Owners shall reasonably require to complete or perfect the transfer of the Vessel (with the benefit and burden of this Charter) pursuant to Clause 44 (a) above, any costs or expenses whatsoever arising in relation thereto to be borne by the Owners.

## 45. THE VESSEL'S FLAG AND CLASS

(a) Flag

The Vessel shall upon the Delivery Date be registered in the name of the Owners under the Liberian flag, provided always that the Owners shall, at any time following the Delivery Date, be entitled to

transfer the flag of the Vessel from the Liberian Ship Register to any other reasonably competitive register as the Owners may select always taking into account the Charterers ability to trade the Vessel.

(b) Class

The Vessel shall during the currency of this charter maintain the class ABS + A1, Oil and Chemical Carrier E + AMS. All recommendations and conditions or other outstanding issues (if any) shall be dealt with and repaired to the satisfaction of the classification society within their respective due dates.

Should the Vessel's Classification Society require structural changes to be made to the Vessel for the Vessel to maintain its present class, Owners shall in good faith consider a request from Charterers for their consent thereto, and such consent shall not be unreasonably withheld.

If, solely due to the fact that the Vessel reaches a certain age, class requirements or compulsory legislation, requires major structural changes to be made to the Vessel for the Vessel to maintain its present class or capacity then such structural changes shall be for Charterers' expense, but Charterers and Owners shall meet and discuss in good faith alternative use of the Vessel with an intention to reduce the costs involved in complying with the new requirements.

If, solely due to the fact that the Vessel reaches a certain age, class requirements or compulsory legislation, requires major structural changes to be made to the Vessel for the Vessel to maintain its class as an oil carrier, then, subject that the Vessel's class and capacity as a chemical carrier is not affected, the Charterers shall not have an obligation to carry out such changes to the Vessel, or, if, solely due to the fact that the Vessel reaches a certain age, class requirements or compulsory legislation deprive the ship of its class as oil carrier, Charterers shall, subject that the Vessels' class and capacity as a chemical carrier is not affected, be released of its obligation to maintain the Vessel's class as an oil carrier.

If structural changes are made to the Vessel according to all of the foregoing, Charterers shall not be required to restore the Vessel to its present structural state.


46. REPRESENTATIONS AND WARRANTIES

The Charterers acknowledge that the Owners have entered into this Charter in full reliance on representations by the Charterers in the following terms, the Charterers now warrant to the Owners that the following statements are, at the date hereof, and on the Delivery Date will be, true and accurate:

(i)     the Charterers are duly incorporated and valid existing under the laws of the republic of the Marshall Islands as a limited partnership;

(ii)    that Hiltveit Associates Inc. is the General Partner (the "General Partner") of the Charterers and thereby is fully liable for all Charterers' obligations under this Charter;

(iii)   the Charterers have the power to conduct their business as it is now carried on, to own and hold or lease their assets, to execute, deliver and perform their obligations under this Charter,

and all necessary corporate, shareholder and other action has been taken to authorise the execution, delivery and performance of such documents;

(iv)    this Charter constitutes, or will upon execution constitute, the valid and legally binding and enforceable obligations of the Charterers ranking at least pari passu with all other of their unsecured obligations and liabilities (actual or contingent) other than any such preferred by law;

(v)    the entry into and performance by the Charterers of this Charter does not, and will not during the Charter Period, violate in any material respect (A) any existing law or regulation or any governmental of official authority or body, or (B) the constitutional documents of the Charterers or (C) any material agreement, contract or other undertaking to which the Charterers are a party or which is binding on the Charterers or any of their assets;

(vi)    all consents, licences, approvals and authorisations required in connection with the entry into, performance, validity and enforceability of this Charter have been obtained and are, or will prior to the Delivery Date be, in full force and effect;

(vii)    no litigation, arbitration or administrative proceeding is taking place against the Charterers or the General Partner or against any of their assets, which is likely to be adversely determined and, if adversely determined, would have a material adverse effect on the Charterers' ability to perform their obligations under this Charter;

(viii)    no Termination Event (as defined in Clause 49 hereof), and no event which with the giving of notice and/or lapse of time and/or relevant determination would constitute a Termination Event, has occurred and is continuing.

The representations and warranties contained in this Clause 46, shall be deemed to be repeated by the Charterers as of the Delivery Date as if made with reference to the facts and circumstances existing on such date, and the rights of the relevant party in respect hereof shall survive delivery of the Vessel hereunder.

## 47. UNDERTAKINGS

The Charterers undertake and agree that throughout the Charter Period they will:

(a) provide to the Owners;

(i)    as soon as possible, but at no event later than 120 days after the end of each financial year of each of the Charterers and of the General Partner, the Charterers' and the General Partner's audited accounts and financial statements for such financial year, such accounts and financial statements to be prepared in accordance with the generally accepted accounting principles in the United States  consistently applied;

(ii)    as soon as possible, but in no event later than 90 days after the end of each financial half-year of each of the Charterers and the General Partners, Charterers' and the General Partner's unaudited six-monthly accounts to be prepared in accordance with the generally accepted

accounting principles in the United States, consistently applied;

(iii)  as soon as practicable after the same are instituted, details of any litigation, arbitration or administrative proceedings which are likely to be adversely determined and, if adversely determined, would have a material adverse effect on the Charterers' ability to perform their obligations hereunder;

(iv)  at or about each anniversary of the Delivery Date during the Charter Period, a written report on the condition of the Vessel prepared by or on behalf of the Charterers in a mutually agreed format;

(v)  at or about each anniversary of the Delivery Date, or when otherwise requested by the Owners, a favourable opinion from an independent insurance advisor appointed by the Charterer and approved by the Owners, at the Charterers expense, but then limited to once per year, confirming that the insurances are consistent with this Charter and the Loan Agreement between the Owners and the Mortgagee, and the practice of prudent operators of vessels such as the Vessels; and

(vi)  from time to time such additional financial or other information relating to the Charterers and their respective business as may be reasonably requested by the Owners;

(b) notify the Owners in writing of any Termination Event (or event of which they are aware which, with the giving of notice and/or lapse of time or other applicable condition would constitute a Termination Event);

(c) obtain and promptly renew from time to time, and will whenever so required, promptly furnish certified copies to the Owners of, all such authorisations, approvals, consents and licences as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;

(d) enter into a technical management agreement with Hiltveit Associates, Inc. (the "Managers"), which shall be approved by the Owners, and not, without the prior written consent of the Owners (such consent not to be unreasonably withheld), dismiss the Manager, alter the Management Agreement or appoint a new manager for the Vessel; and

(e) not, without the prior written consent of the Owners, dispose of a substantial part of the business;

(f) not, without the prior written consent of the Owners and the Mortgagee, during the first 3 years of the charter pay any dividend or make any distribution of cash or other payments to it's the General Partner (except for reasonable payments to the General Partner acting in its capacity as Manager of the Vessel and which are provided for in the management agreement approved by the Owners) or the limited partners in the Charterers, and after 3 years of charter, not to pay dividend or make any distribution of cash or other payments to its General Partner (except for reasonable payments to the General Partner acting in its capacity as Manager of the Vessel and which are provided for in the management agreement approved by the Owners) or the limited partners or affiliated company if the

Free Cash (being the Charterers' cash plus amounts on deposit in the accounts of the Charterers, including in the pledged account referred to in Clause 47 (h)) and other equity investments of the Bareboat Charterer as approved by the Banks and the Owner (if any) following such distribution and/or dividend, is less than USD 6,000,000. In respect of determining a value for equity investments in vessels, the formula for valuation to be standard formula used by the Mortgagee in appraising value of vessel investments - unless otherwise agreed, the value of a vessel to be the market value of that vessel determined as the average of valuations obtained from Fearnleys and OK Maritime on the basis of the vessel being charter-free and ready for prompt delivery based.

(g) not, without the prior written consent of the Owners, change their business in any material respect;

(h) maintain deposited in a bank account pledged in favour of the Mortgagee and the Owner (being account number _____ held by the Charterers with _____Bank) a minimum of USD 4,000,000 (the "Pledged Amount").

   (aa) Subject to the Owners consent which shall not be unreasonably withheld, the Charterers shall have the right to use the Pledged Amount or any parts thereof for equity investments in future vessel purchases. If any part of the Pledged Amount is used as such equity payment, the Owners shall have a first priority pledge of the shares in the special purpose subsidiary owning the new vessel, securing this amount only, or a second priority pledge, in the event that the bank financing any such new vessel purchases requires as a condition for such financing a first priority pledge of such shares.

   (bb) USD 500,000 of the Pledged Amount may, if required, and subject to the consent of the Owners and the Mortgagee, be used by the Charterer for operation of the Vessels.

   (cc) After the completion of 6 years under this Charter, the Owners shall consider in good faith a request from the Charterers to reduce the Pledged Amount.

   If any amount deposited into the above account is used for the operation of the Vessel (or of Martha A), the deposits shall again be built up as soon as possible after such use.

(i) not permit or suffer any declared default giving rise to acceleration of any indebtedness to arise under or in respect of any of their financial agreements or obligations from time to time entered into or assumed by the Charterers, and will notify the Owners in writing of the occurrence of any declared default under or in respect of such agreements or obligations;

(j) obtain, if the Vessel at any time shall call on any US port, in accordance with the regulations of the US Oil Pollution Act 1999 (as same may be amended and/or re-enacted from time to time) and in line with the requirements of the US Coast Guard in time a Certificate of Financial Responsibility (C.O.F.R), a copy of which shall promptly be provided to the Owners;

(k) procure that US Voyage Declarations are timely submitted in accordance with the P&I Terms of cover;

Owners undertake and agree throughout the Charter Period, they will maintain and hold in strictest confidence all financial and other information provided by Charterer to Owners under this Charter, provided, however, that the Owner shall be permitted to give to the Mortgagee such information as the Mortgagee may request or require.

48. INSURANCES. TOTAL LOSS AND COMPULSORY ACQUISITION

(a) For the purposes of this Charter, the term "Total Loss" shall include actual or constructive or compromised or agreed or arranged total loss of the Vessel including any total loss as may arise during a requisition for hire. "Compulsory Acquisition" shall have the meaning assigned thereto in Clause 23 (b) hereof.

(b) The Charterers undertake with the Owners that throughout the Charter Period;

    (i)    without prejudice to their obligations under Clause 12 hereof, they will keep the Vessel insured on the basis of the Norwegian Marine Insurance Plan, as amended, on Institute Time Clauses (Hull) or American Institute Time Clauses applicable to a vessel of the kind and type involved here (and against such further risks as may from time to time be required by the Mortgagee), with such insurers (including P & I and war risks associations) as shall be reasonably acceptable to the Owners with deductibles reasonably acceptable to the Owners (it being agreed and understood by the Charterers that there shall be no element of self-insurance or insurance through captive insurance companies without the prior written consent of the Owners);

    (ii)    the policies in respect of the insurances against fire and usual marine risks and the policies or entries in respect of the insurances against war risks, shall, in each case, be endorsed to the effect that payment of a claim for a Total Loss will be made to the Owners (or the Mortgagees as assignees thereof) (who shall upon the receipt thereof apply the same in the manner described in Clause 48 (f) hereat);

    (iii)    the Charterers shall procure that duplicates of all cover notes, policies and certificates of entry shall be furnished to the Owners for their custody;

    (iv)    the Charterers shall procure that the insurers and the war risk and protection and indemnity associations with which the Vessel is entered, shall (A) furnish the Owners with a letter or letters of undertaking in such form as may from time to time be reasonably required by the Owners, and (B) supply to the Owners such information in relation to the insurance effected, or to be effected, with them as the Owners may from time to time reasonably require; and

    (v)    the Charterers shall use all reasonable efforts to procure that the policies, entries and other instrument evidencing the insurances are endorsed to the effect that 'the insurers shall give to the Owners not less than thirty (30) days prior written notifications of any amendment, suspension, cancellation or termination of the insurances.

(c) Notwithstanding anything to the contrary contained in Clause 12 and 48 (b) hereof, the Vessel shall be kept insured during the Charter Period in respect of marine and war risks on hull and machinery basis for an amount not less than the greater of (A) 120 % of the market value of the Vessel determined as the average of valuations obtained from Fearnleys and OK Maritime (or such other ship brokers as the Owners and Charterers may agree) on the basis of the Vessel being charter-free, ready for prompt delivery (the "Market Value") and (B) the amounts specified in column (b) in the table set out below in respect of the yearly period during the Charter Period specified in columns (a) against such amount (which insurance amount hereinafter referred to as the "Minimum Insured Value");

| (a)                   | (b)                         |
|-----------------------|-----------------------------|
| Twelve-monthly Period | Minimum Insured Value (USD) |
| 0                     | 11,700,000                  |
| 12                    | 10,870,000                  |
| 24                    | 10,000,000                  |
| 36                    | 9,200,000                   |
| 48                    | 8,370,000                   |
| 60                    | 7,530,000                   |
| |72                   | 6,700,000                   |
| 84                    | 5,870,000                   |

The insured value for Hull and Machinery (as opposed to Hull and Hull Interest( if Norwegian Policies) or hull and increased value or total loss only (if IT or American Clauses used) shall always cover at least 80 % of the market value.

(d) Notwithstanding anything to the contrary contained in Clause 12 and 48 (b) hereof, the Vessel shall be kept insured during the Extended Period in respect of marine and war risk on hull and machinery basis as above for an amount to the greater of 120 % of the market value of the Vessel (as determined annually on the same basis as specified in Clause 48 (c) hereof.

(e) (i) If the Vessel shall become a Total Loss or be subject to Compulsory Acquisition, the chartering of the Vessel to the Charterers hereunder shall cease, and the Charterers shall immediately pay to the Owners all hire, and any other amounts, which have fallen due for payment under this Charter, and have not been paid as at and up to the date on which the Total Loss or Compulsory Acquisition occurred (the "Date of Loss") together with interest thereon at a rate of LIBOR plus 4 % from the due date and up to actual payment, and shall cease to be under any liability to pay any hire, but not any other amounts, thereafter becoming due and payable under this Charter.

(ii) For the purpose of ascertaining the Date of Loss;

(A) an actual total loss of the Vessel shall be deemed to have occurred at noon (London time) on the actual date the Vessel was lost, but in the event of the date of the loss being unknown, the actual total loss shall be deemed to have occurred at noon (London time) on the date on which it is acknowledged by the insurers to have occurred;

(B) a constructive, compromised, agreed or arranged total loss of the Vessel shall be deemed to have occurred at noon (London time) on the date that notice claiming such a total loss of the

Vessel is given to the insurers, or, if the insurers do not admit such a claim, at the date and time at which a total loss is subsequently admitted by the insurers or adjudged by a competent court of law or arbitration tribunal to have occurred. Either the Owners, or with the prior written consent of the Owners (such consent not to be unreasonably withheld), the Charterers shall be entitled to give notice claiming a constructive total loss, but prior to the giving of such notice there shall be consultation between the Charterers and the Owners and the party proposing to give such notice, shall be supplied with all such information as such party may request; and

    (C) Compulsory Acquisition shall be deemed to have occurred at the time of occurrence of the relevant circumstances described in Clause 23 (b) hereof.

(f) All monies payable under the insurance effected by the Charterers pursuant to Clauses 12 and 48, or other compensation, in respect of a Total Loss or pursuant to Compulsory Acquisition of the Vessel shall be received in full by the Owners (or the Mortgagees as assignees thereof).

(g) Subject always to the Owners' and Mortgagees having received not less than ten (10) days prior written notice thereof in the case of any payment in excess of USD 250,000 (or the equivalent thereof in another currency), and the Owners not being in breach of any loan agreement with any of the Mortgagees, any monies payable under such insurances in respect of a partial loss shall be paid to the Charterers (and the Owners shall consent to such payment to the Charterers) if (A) the repairs in respect of which such payment is made have been, or are in the course of being, effected, and (B) the Charterers are not in breach of any of their payment or other material obligations under this Charter.

If, due to Owners being in breach of a loan agreement, and to the extent such breach is not due to the Charterers being in breach of this Charter, insurance proceeds in respect of a damage to the Vessel are not, as a consequence of the above, paid to the Charterers, the Owners agree that the Charterers shall until such date when the insurance proceeds are actually received by the Charterers be relieved of (i) their obligations hereunder to procure the repair of the relevant damage, and, (ii) if, and to the extent the Vessel's earnings thereby is affected, to paying charter hire hereunder,

(h) The provisions of Clauses 12 and 48 hereof shall not apply in any way to the proceeds of any additional insurance cover effected by the Owner and/or the Charterers for their own account and benefit, provided that such additional insurance cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 12 hereof, permit.

(i) In the event of a conflict between the provisions of this Clause 48 and Clause 12, the provisions of Clause 48 shall govern and prevail.

49. TERMINATION EVENTS

(a) Each of the following events shall be a "Termination Event" for the purposes of this Charter;

    (i)   if any instalment of hire or any other sum payable by the Charterers under this Charter shall not be paid on its due date or (in the case only sums expressed to be payable by the Charterers on demand) within five (5) Banking Days (in Oslo and New York City) following the date of

demand therefore and such failure to pay is not remedied within ten (10) Banking Days (in Oslo and New York City) of receipt by the Charterers of written notice from the Owners notifying the Charterers of such failure and requesting remedial action; or

(ii)  if either (A) the Charterers shall fail at any time to effect or maintain any insurance required to be effected and maintained under this Charter, or any insurer shall avoid or cancel any such insurances, or the Charterers shall commit any breach of or make any misrepresentation in respect of any such insurance the result of which is to entitle the relevant insurer to avoid the policy, or otherwise to be excused or released from all or any of its liabilities thereunder to the Owners (unless prior to the relevant insurer exercising any such right, he expressly and irrevocably waives the breach of misrepresentation in question), or (B) any of the said insurances shall cease for any reason whatsoever to be in full force and effect (other than were the reason in question is outside the reasonable control of the Charterers, and the relevant insurances are reinstated or reconstituted in a manner meeting the requirements of this Charter within seven (7) days of such cesser); or

(iii) if the Charterers or the General Partner shall at any time fail to observe or perform any of their or its obligations under the Charter (or in respect of the General Partner any other obligation it has or may have) which obligations the Owners reasonably consider to be material, other than those obligations referred to in sub-clause (i) or sub-clause (ii) of this Clause 49 (a), and such failure to observe or perform any such obligation is either not remediable or is remediable, but is not remedied within thirty (30) days of receipt by the Charterers, or (as the case may be) by the General Partner of written notice from the Owners requesting remedial action; or

(iv) if any representation or warranty of the Charterers or the General Partner made (or acknowledged to have been made) by the Charterers and/or the General Partner (as the case may be) in connection with this Charter or otherwise or in any document or certificate furnished to the Owners in connection herewith or therewith shall prove to have been untrue, inaccurate or misleading in any material respect when made (and such occurrence continues unremedied for a period of thirty (30) days after receipt by the Charterers and/or (as the case may be) the General Partner of written notice from the Owners requesting remedial action); or

(v)  if a petition shall be presented (and not withdrawn or stayed within thirty (30) days) or an order shall be made or an effective resolution shall be passed for the administration or winding-up of the Charterers (other than for the purpose of a reconstruction or amalgamation during and after which the Charterers remain, solvent, the terms of which have been previously approved in writing by the Owners which approval shall not be unreasonably withheld) or if an encumbrances shall take possession or an administrative or other receiver shall be appointed of the whole or any substantial part of the property, undertaking or assets of the Charterers, or if an administrator of the Charterer shall be appointed (and, in any such case, such possession is not given up or such appointment is not withdrawn within thirty (30) days) or if anything analogous to any of the foregoing shall occur under the laws of the place of the Charterers' incorporation; or

(vi) if the Charterers shall stop payments generally or shall cease to carry on or suspend all or a substantial part of their business or shall be unable to pay the debts, or shall admit in writing the inability to pay their debts, as they become due or shall otherwise become or be adjudicated insolvent; or

(vii) if the Charterers shall convene a meeting of all or any class or group of their creditors with a view to proposing or making, or shall propose or make, any arrangement or composition with or assignment for the benefit of all or any class or group of the creditors or shall declare or apply to any court or other tribunal for, a moratorium or suspension of payments with respect to all or a substantial part of their debts or liabilities; or

(viii)(A) the Vessel is arrested or detained (other than for reason solely attributable to the Owners), and such arrest or detention is not lifted within twenty one (21) Days (or such longer period as the Owner shall agree in the light of all the circumstances) or (B) if a distress or execution shall be levied or enforced upon or sued-out against all or any substantial part of the property or assets of the Charterers and shall not be discharged or stayed within thirty (30) days; or

(ix) any of the events or circumstances described in sub-clauses (v), (vi), (vii) and (viii) hereof or any event or circumstances analogous thereto arise (mutatis mutandis) in relation to the General Partner; or

(x) if, without the prior written consent of the Owners, there has been a change in ownership of the Charterers or of the General Partner or any other partner in the Charterers.

(xi) if any declared default arises and is continuing under or in respect of any substantial financial agreement or obligation from time to time entered info or assumed by the Charterers or the General Partner (provided, however, that the occurrence of any such declared default shall not constitute a Termination Event if the indebtedness the subject declared default is not accelerated); or

(xii) if any consent, authorization, licence or approval necessary for this Charter to be or remain the valid and legally binding obligation of the Charterers, or to enable the Charterers to perform their obligations hereunder, shall be materially adversely modified or is not granted or is revoked, suspended, withdrawn or terminated or expires and is not renewed (provided that the occurrence of such circumstances shall not give rise to a Termination Event if the same are remedied within thirty (30) days of the date of their occurrence; or

(xiii) If the Charterers or the Seller or the Martha A Seller is in breach of any of its obligations under any of the Related Contracts.

(c) The occurrence of a Termination Event shall entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel under this Charter and recover any and all amounts due and payable hereunder and/or resulting from such termination, (subject, however, to Owners obligation to mitigate loss).

## 50. OWNERS' RIGHTS ON TERMINATION

(a) At any time after a Termination Event shall have occurred and be continuing, the Owners may, by notice to the Charterers, immediately or on such date as the Owners shall specify, terminate the chartering by the Charterers of the Vessel under this Charter, whereupon the Vessel shall no longer be in the possession of the Charterers with the consent of the Owners, and the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 14

(b) On or at any time after termination of the chartering by the Charterers of the Vessel pursuant to Clause 49 (a) hereof, the Owners shall be entitled (but not bound and without prejudice to the Charterers obligations under Clause 14 hereof) to retake possession of the Vessel.

(c) Following termination of the chartering of the Vessel hereunder pursuant to Clause 49 (a) hereof, the Charterers (i) shall continue to comply with their obligations under this Charter until the Vessel is redelivered to the Owners in accordance with Clause 14 hereof, and (ii) shall (subject to the provision of Clause 42) pay, or reimburse, to the Owners on demand all Losses suffered by the Owners in connection with such termination including, without prejudice to the generality of the foregoing, all liabilities, costs and expenses so incurred in recovering possession of, and in moving, storing, insuring and maintaining the Vessel and in carrying out any works or modifications required to cause the Vessel to conform with the provisions of Clause 14 hereof together with interest thereof pursuant to Clause 38 (e) from the date on which the relevant Loss was suffered by the Owners until the date of payment or reimbursement thereof (both before and after relevant judgement or winding-up of the Charterers).

## 51. ASSIGNMENT, SUB-CHARTER

(a) The Charterers shall not be entitled to assign or transfer this Charter without the prior written consent of the Owners.

(b) The Charterers may let the Vessel by way of time or voyage charter to any person provided that;

   (i)    Any such sub-charter shall not relieve or discharge the Charterers or the Guarantor from any of their obligations contained in this Charter or the Guarantee;

   (ii)   no such charter shall be of a duration which expires, or which by virtue of any optional extensions therein contained could expire, other than on the last date of the Initial Period or, following exercise by the Charterers of the Charterers' Option, after the last day of the Extended Period; and

(c)

## 52. OWNERS' COVENANTS ETC.

The Owners hereby covenant and undertake that as so long as they shall have not commenced exercising any of their rights under or pursuant to Clause 49 hereof neither the Charterers nor any permitted sub-charterers shall be disturbed or interfered with in their quiet and peaceful use, possession and enjoyment of the Vessel (except as expressly provided for herein).

## 53. REDELIVERY

The Off-Hire Survey referred to in Clause 6 hereof, shall take place at the port of redelivery at or about the time of redelivery.

(a) Without prejudice to the provisions of Clause 14 hereof, the Vessel shall on redelivery to the Owners hereunder;

(i)    maintain the class ABS + A1, Oil and Chemical Carrier E + AMS (or any equivalent class which the Vessel may attain pursuant to this Charter and/or which may be required or necessary or desirable for the trade of the Vessel), free of conditions of class or other outstanding issues with the classification society and with valid, unextended certificates for not less than six (6) months; and

(ii)   be redelivered to the Owners together with spare parts and other equipment at minimum required by the Vessel's class. Additional spares and equipment on board, shall be deemed to be a part of the Vessel on redelivery and shall be taken over by the Owners free of charge;

(iii)  have been dry-docked at the Charterers' time and expense to the satisfaction of the classification society within six (6) months prior to the redelivery date, and

(iv)   have had her underwater parts treated with ample anti-fouling to last for the ensuing period up to the next scheduled dry docking of the Vessel.

(v)    have her survey cycles up to date, and with next special survey after redelivery due not earlier than 6 months of the redelivery date.

Without prejudice to the foregoing, the Charterers shall, if requested so to do by the Owners, assign to the Owners at the redelivery all and any such rights as they may have under the Charterers' insurances for the Vessel in respect of damage to the Vessel, whether or not then known other than any rights to be reimbursed by insurers for costs previously incurred by the Charterers.

(b)    (i)    The Owners shall, during a period of twenty (20) days prior to the Redelivery Date, be entitled, at their own risk and expense, to place representatives on board the Vessel for familiarisation purposes, subject to signing of standard indemnity letter.

       (ii)   without prejudice to the generality of the provisions of Clause 6, any inspection of the Vessel carried out pursuant thereto, may include an under-water inspection of the Vessel provided that the same shall be carried out during such time as she is in port (such inspection not to interfere with or interrupt the trading of the Vessel). Such under-water inspection shall be carried out by a class-approved diver in liaison with a class surveyor.

54. INTENTIONALLY LEFT BLANK

55. COMMUNICATIONS

Except as otherwise provided for in this Charter, all notices or other communications under or in respect of this Charter to either party hereto shall be in writing and shall be made or given to such party at the address, telex number or fax number appearing below, or at such other place as such party may hereafter specify for such purpose);

(i)    in the case of the Owners:

Zarepta Chemical KS

c/o Morten Werrings Rederi AS
Strandveien 50 D
1366 Lysaker
Norway


Fax number: 47-67 51 84 70

(ii) in the case of the Charterers:

[_____]
[_____]
[_____]
[_____]

Fax number: [_____]


A written notice includes a notice by telex or fax. A notice or other communication received on a non-working day or after business hours in the place of receipt, shall be deemed to be served on the next following working day in such place. Subject always to the foregoing sentence, any communication by personal delivery or letter shall be deemed to be received on delivery, any communication by telex shall be deemed to be received upon transmission of the automatic answerback of the addressee, and any communication by fax shall be deemed to be received upon appropriate acknowledgement by the addressee's receiving equipment.

All communications and documents delivered pursuant to or otherwise relating to this Charter, shall be either in English or accompanied by a certified English translation.

56. GOVERNING LAW JURISDICTION

This Charter shall be governed by and construed in accordance with Norwegian law. Any dispute arising in connection herewith, which cannot be amicably settled, shall be referred to Oslo City Court.

**EXHIBIT B**

 Bank of Tokyo-Mitsubishi UFJ

BTMU Capital Corporation
111 Huntington Avenue, Suite 400
Boston, MA 02199
Phone: 617-573-9000
Fax: 617-345-5153

May 23, 2008

Eilen Lund
Zarepta Chemical KS
c/o Fearnley Finans AS
Fax: 011 47 22 93 63 30
e.lund@fearnleys.no

### INVOICE # V- 1831

Zarepta Chemical KS                3 MONTH LIBOR 3.09000% plus 2.10%
Rate for the period of:

|  | Begin Date | End Date | # of Days | Balance | All-In Rate | Int Amt |
|---|---|---|---|---|---|---|
| Interest | 2/28/2008 | 5/28/2008 | 90 | 5,752,500.00 | 5.19000% | $74,638.69 |
| Principal |  |  |  |  |  | $416,500.00 |

Total Due May 28, 2008:        $491,138.69

If you have any questions, please contact Andrea Sacco at 617-345-5784

Remit by wire to:
  Bank of America
  100 West 33rd Street
  New York, NY

Account Name:        BFC Assets, Inc.
Account #:           53174877
ABA Number:          026 009 593
Attn: Zarepta Chemical KS

# EXHIBIT C

Corporate Netbank                                                      Page 1 of 1



Printed by customer on 02.06.2008 08:27:09 GMT +0

---

Printed by  Hilde Østby 02.06.2008 08:27:09 GMT +0

| This document is not a confirmation of a processed payment |
| --- |

| **From account** | **To account** | **Country** |
| 6019.04.43348  Nordea NO  USD  ZAREPTA CHEMIC | 53174877 | USA |
| **Payment type** | **Beneficiary's name and address** | |
| NO:Cross-border payment | BTMU Capital Corporation | |
| | 111 Huntington Avenue, Suite 400 | |
| | Boston, MA 02199 | |
| | | |
| | **SWIFT/BIC** | |
| | BOFAUS3NXXX | |
| | | |
| | **Amount** | |
| | 491.138,69  USD | |

| **Execution date (dd.mm.yyyy)** | **Message to the beneficiary** |
| 28.05.2008 | Interest and principal, invoice nr 1831 |
| **Payment urgency** | |
| Urgent | **Charges** |
| | Our |
| **Beneficiary's nationality** | |
| USA | |

| **Regulatory reporting** | |
| **Transfer purpose** | **Supplementary transfer purpose text** |
| 31 Interest | Interest and installments |

Payment number   22000000043431731732CN
Legacy payment number NO1-U-NC14820-00121919

Payment status  Processed

© Nordea 2004.