249-08/DPM/MAM
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
STOLTHAVEN HOUSTON INC.
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900 / Fax: (212) 425-1900
Don P. Murnane, Jr. (DM 3639)
Manuel A. Molina (MM 1017)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

STOLTHAVEN HOUSTON INC.,

                    Plaintiff,

     -against-

RACHEL B, its engines, tackle apparel, etc., *in rem*,
and
HILTVEIT ASSOCIATES, INC. and ZAREPTA
CHEMICAL KS, *in personam*,

                 Defendants.

-----------------------------------------------------------

**08 CIV. 4327 (RPP)**

**DECLARATION OF
DANIEL CARR, ESQ.
IN OPPOSITION TO
MOTION TO VACATE
ORDER OF ATTACHMENT**

I, Daniel Carr, declare as follows:

    1.    I am Assistant General Counsel of Stolt Nielsen USA Inc. ("Stolt") in

Norwalk, Connecticut. Stolt, together with its affiliates, is a worldwide ship owning,

marine terminal, and transportation group. In my capacity as Assistant General Counsel

to Stolt, I represent the interests of Stolt's affiliate company, Plaintiff Stolthaven Houston

Inc. ("Stolthaven").

    2.    I have also for many years regularly reviewed, negotiated and been

involved in disputes arising from vessel charter parties. Prior to my employment at Stolt

in 2000, I worked for several years as a practicing maritime attorney in New York at a

leading maritime law firm, Healy and Baillie. Prior to that I was employed as an attorney in the marine insurance industry for five years with ASSURANCEFORENINGEN SKULD in Oslo, Norway, where I dealt further, in part, with maritime charter parties. I am admitted to practice before this Court.

3.    In early March of this year, the United States Coast Guard detained the Liberian flag chemical tanker, "Rachel B", at Stolthaven's #2 Berth in Houston. The detention resulted from a series of vessel safety deficiencies uncovered by Coast Guard inspectors while the Rachel B occupied Stolthaven's berth. The violations related to the vessel's emergency fire fighting equipment and were deemed serious enough by the Coast Guard inspectors that they ordered the loading of the vessel stopped and prohibited the vessel from leaving the berth. It was not until several days later that the deficiencies were apparently corrected by the owner, and the vessel released by the Coast Guard.

4.    The vessel had called at Stolthaven pursuant to the terms of the Stolthaven Marine Tariff ("Tariff"), a copy of which is attached hereto as **Exhibit "A"** (and which was also attached to the Verified Complaint as Exhibit "A".) The Tariff, which had been previously provided to agents of the owners of the Rachel B, set forth, at paragraph (2) page 3, "LAYBERTH CHARGES" assessable at $5,000 per hour in cases where a vessel failed to vacate the berth within the time allotted for loading or discharging cargo. (The aggregate Layberth charges which had been incurred during the Rachel B detention period totaled $269,754.38.)

5.      Upon being advised that the Rachel B had been ordered by the Coast Guard to remain at the berth, Stolt promptly advised the ship's owners, through the vessel's managers, Messrs. Hiltveit Associates Inc. ("Hiltveit"), that Stolthaven intended to assess Layberth charges in accordance with the Tariff. Attached hereto as **Exhibit "B"** is a copy of the correspondence with the vessel manager starting with the initial exchange between Stolt's U.S. Gulf Tankers and Terminals Operations Manager, Captain David Coiley, in Houston and Hiltveit on Wednesday March 5th at 1406 hrs. (2:06 p.m.), plus subsequent correspondence relating to the dispute as communicated between myself and Mr. Carl G. Hiltveit representing Hiltveit, the vessel's manager.

6.      At no time prior to, during the incident, or thereafter, until the appearance by defendant Zarepta Chemical KS ( "Zarepta") in these proceedings, was Stolt or Stolthaven ever advised or aware of any purported bareboat charter existing between Zarepta as registered owner of the Rachel B, and "Norfolk L.P".     As the contemporaneous correspondence indicates, at no time during any of my communications with Mr. Hitlveit was "Norfolk L.P." ever mentioned, and indeed Mr. Hiltveit specifically stated that he was communicating and acting for and on behalf of "vessel interests", a phrase which is commonly known in the maritime commercial and legal community to include the registered owner of a vessel. (See **Exhibit "B,"** Mr. Hiltveit's e-mail communication of March 14, 2008 at 3:52 p.m. stating **"the vessel interests did all within their power to promptly correct the deficiencies found by the Coast Guard..."**, emphasis added). Further, at no time did Stolt receive any documentation or communications in any form from any employee, officer or principal at Norfolk L.P.

NYDOCS1/306629.1                  3

7.    As best as currently can be determined, Norfolk L.P. is no more than a nominal "limited partnership" registered "on paper" in the Marshall Islands but without any mailing address, telephone, email, or any contact details whatsoever. The charter on which Zarepta now relies in its attempt to insulate itself from in personam liability under the Stolthaven Tariff, tellingly indicates, at Clause 55, that "all ... communications under or in respect of this Charter shall be in writing and shall be made or given to such party at the address, telex number or fax number appearing below ... (ii) in the case of the Charterers:

[_____]

[_____]

[_____]

[_____]

Fax number: [_____] "

(See Werring Declaration, Exhibit A, Clause 55).


8.    Subsequent to the incident at Stolthaven, and after having sailed from U.S. waters in March, the Rachel B was promptly detained again, this time for several days by authorities in England.  In late April, early May 2008, while calling at Falmouth, the "United Kingdom's Marine and Coast Guard Agency" ("MCA") detained the Rachel B on a number of ongoing and numerous "International Safety Management" violations and breaches.   The incident was reported by England's official "Central Office of Information" News Distribution Service (COI – NDS) and then carried in the trade press.

A copy of the COI-NDS report dated May 1 2008 is attached hereto as **Exhibit "C"** ( and can also be found at the UK government web cite: http://nds.coi.gov.uk/content/detail.asp?NewsArea ID=2&ReleaseId=366318 .)

9.     The COI-NDS report indicates that during the Falmouth detention incident, the MCA office in Falmouth had direct discussions with the vessel owners, namely "Zarepta Chemical KS in Norway" in which "Zarepta [were] informed of the decision to detain this vessel" and that the vessel would be allowed to remain in Falmouth for a short time while the deficiencies were corrected. There is no mention in the report of any bareboat charter, or of any connection whatsoever between "Norfolk L.P." and the Rachel B, or Hiltveit and the vessel for that matter.   Contemporaneous news articles reported similarly that discussions regarding the incident had been conducted "with the vessel owners, Zarepta Chemical KS in Norway" who had "been informed of the decision to detain this vessel" for an array of faults "not in accordance with international safety management" and arising mainly in the vessel's engine room which the MCA spokesman described as "an oily mess with corroded pipes, faulty and broken gauges and pumps." **(Exhibit "D")**   This information was made known to me prior to the filing of the instant attachment proceedings.

10.     I have reviewed in detail Zarepta's motion papers, including the affidavit of Mr. Honan and the declaration of Mr. Werring (who is described as the Chairman of Zarepta in Norway) each of whom summarily conclude or assume that the "bareboat charter" which they have produced fully and completely divests Zarepta of control and

operation of the Rachel B and fully "demises" such control and operation to Norfolk L.P, in the Marshall Islands.

11.    However, even a cursory review of the document is sufficient to dispel any such notion. The form **"BIMCO -- Barecon 89 Standard Bareboat Charter"** on which the Zarepta charter is prepared has been substantially altered, with the vast majority of the true bareboat clauses having been deleted, substituted for, or otherwise extinguished by 24 lengthy "Additional Clauses" which radically amend the standardized terms of the form. On a full reading of the amended charter, it is clear that Zarepta has not fully divested itself of control over the technical management, operation and control of the vessel as is required as a matter of law in order to insulate the registered owner from in personam liability.

12.    For example, while Clause 9 of the BIMCO form contains the standard wording that the vessel shall be "under the complete control in every respect" and "at the absolute disposal for all purposes" of the Charterer, Additonal Clause 47 (d) makes clear **on its face** that Zarepta **retained full control over** (a) approval of the terms and conditions of the Rachel B's **technical management agreement** with Hiltveit Associates, Inc. (the "Managers") as well as (b) decisions regarding the **dismissal of the vessel Manager** (c) **alteration of the management agreement** and (d) **appointment of a new manager** for the vessel. This expressed retention of a substantial say in the control and technical management of the Rachel B is alone sufficient, as a matter of law, to negate the attempt by Zarepta to insulate itself from in personam liability as a true and

authentic bareboat owner. Zarepta's position before this Court is fundamentally undercut by the very charter it has supplied to the Court, apparently without sufficient advance review and consideration.

13.   A further example of Zarepta's continuing operational control over the Rachel B is contained at Additional Clause 46 (h) (bb), pursuant to which a $4M bank account maintained by Charterer is "pledged **in favour of …the Owner** [Zarepta]" and $500,000 of which may be used **"for operation of the vessel" "subject to the consent of the Owners"**. The Clause goes on to state that any amount deposited in the account **"used for operation of the Vessel"** shall be replenished as soon as possible after such use.   Clearly this arrangement is far from a true arms-length bareboat charter where a registered owner surrenders full and complete control over the vessel operations to the charterer in exchange for periodic hire payments.   This clause vests Zerepta with direct control to approve or disapprove payments used directly for the **"operation of the vessel."**

14.   Similarly, Additional Clause 47 (g) vests Zarepta with ongoing "written consent" approval authority over Charterer's decision to "change their business in any material respect".   With respect, this is hardly a touchstone indication of any true autonomy vested in Norfolk L.P as Charterer.

15.   In sum, the "bareboat charter" supplied to this Court by Zarepta, in its effort to defeat the attachment, is not a bareboat charter at all.   Zarepta has clearly and

expressly retained substantial control over the operation and management of the Rachel B. Such retention of control fatally dispenses with any purported right of insulation from liability as a true bareboat charterer. Zarepta's attempt to escape in personam liability through cleverly labeled legal documents and a Marshall Islands "Limited Partnership" over whose business Zarepta retains control as to any "material respect" (Additional Clause 47(g)) should be rejected and the attachment maintained.

16.    Pursuant to 28 USC § 1746 (2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 13, 2008

DANIEL CARR

**EXHIBIT A**



# STOLTHAVEN HOUSTON INC.

## MARINE TARIFF

**Revised April 1, 2007**

## VESSEL TENDERING RULES:

The proper tendering of ships and barges at Stolthaven Terminal is considered to be a very intrical part of traffic control and allows us to provide efficient turn around times for all vessels calling the facility. Stolthaven Terminal operates on a first come, first serve basis with regards to tendering times. The tendering rules set forth are to be strictly adhered to at all times without deviation.

When tendering a vessel to Stolthaven, docking instructions will be given at that time with regards to dock assignment, side along side and estimated berthing prospects. A ship or barge that still has a product hose connected and attempts to tender to Stolthaven will be considered an illegal tender. Any vessel or vessel's agent attempting to illegally tender to Stolthaven will be assessed a $5000.00 fine. Full payment of this fine will be required in advance before the vessel is allowed to be berthed at Stolthaven.

### Ships

When tendering a ship to Stolthaven, the ship must be ready in all respects to load/unload cargo. Ships may tender to the terminal when arriving the Galveston Bar location or from other berths. When tendering from other berths, all product hoses must be disconnected from the vessel before the tender is considered valid or legal. Upon tendering a ship to the terminal, the ship will receive a tender confirmation number. This confirmation number will be used in the case that any disputes arise with regards to the legal tendering of a vessel to the terminal. If a vessel or vessel's agent does not secure a tender confirmation number from the terminal, the ship will not be considered legally tendered to the facility.

### Barges

Barges may tender to Stolthaven at any time they are ready in all respects to load/unload cargo. Barges may tender from the barge fleets located within the Houston/Galveston area or within 4 hours sailing time to the terminal or from other berths. When tendering a barge from another berth, all product hoses must be disconnected from the barge before the tender is considered valid or legal. Barges tendering from cleaning facilities may tender once the barge is considered clean, dry and odor free. No tenders will be accepted from barges at a cleaning facility that are undergoing the cleaning process. Upon tendering a barge to the terminal, the barge will receive a tender confirmation number. This confirmation number will be used in the case that any disputes arise with regards to the legal tendering of a barge to the terminal. If a barge or barge's agent does not secure a tender confirmation number from the terminal, the barge will not be considered legally tendered to the facility.

### Ship & Barge Readiness

For clarification with regards to ship/barge readiness, during times of high congestion within the Port of Houston and or Stolthaven, the terminal may require that ship/barge tanks be pre-inspected, pre-purged and or pre-sampled before arriving at the dock based on customer requirements.

A.   LAYBERTH CHARGES:

Stolthaven Houston (herein referred to as the TERMINAL) offers the use of the TERMINAL's docks for the purpose of layberth for any approved vessel.  Layberth utilization shall not interfere or conflict in any way with vessels conducting or desiring to conduct regular contractual activities at the TERMINAL's docks.  Vessels wishing to layberth at the TERMINAL's docks must first request and receive approval from the TERMINAL's Customer Service Department and the Operations Department.

Upon receipt of four (4) hours notice for ships and two (2) hours notice for barges, the TERMINAL dock shall be promptly vacated at the vessel's expense.  Failure to comply with the TERMINAL's vacant rule can result in an additional $5,000 per hour charge from the end of the notice period until the dock is vacated.  Vessel must be cargo ready upon arrival.  If not, layberth will start incurring.

The TERMINAL reserves the right to require any vessel to immediately vacate the TERMINAL's dock for any violation of the TERMINAL's rules and regulations.

The TERMINAL requires ships to keep the mooring lines tendered at all times as per the ISGOTT manual.  Minimum mooring is four (4) spring lines and two (2) breast lines.

1.   Ships at Docks 2 and 3:  (Layberth Only)

Layberth shall be charged based on the overall length of the vessel, as shown in the Lloyd's Register of Shipping.  If the ships length is not available in the Lloyd's Register of Shipping, the ship's Certificate of Register, showing length, will be accepted.

| L.O.A. in Feet | Rate per Foot per 12 Hour Period |
|---|---|
| 0-500 | $4.86 |
| 501-550 | $5.72 |
| 551-600 | $6.58 |
| 601-700 | $7.44 |
| 701-800 | $8.58 |
| 801-860 | $10.58 |

The minimum charge for any ship will be at the above rate for the first period of twelve (12) hours or any fraction thereof (i.e. minimum 12 hour layberth charge)

2.   After the first twelve (12) hours, any period of berth occupancy of twelve hours (12) or less will be billed at one-half (1/2) of that day's rate.  ($1325.00 minimum per 12 hours, after the first 12 hours)

2.    Barges at Ship Dock 2 and 3 or Barge Dock:

| L.O.A. in Feet | Rate per 12 Hour Period |
|---|---|
| Flat Rate for all barges | $400.00 |

The minimum charge for any barge will be at the above rate for the first twelve (12) hours or any fractional thereof. (i.e. minimum 12 hour layberth charge)

If a vessel shifts from one TERMINAL berth to another during the first twelve (12) hour layberthing period, a switching fee of one-half (½) the rate for the first twelve (12) hour period rate will be charged in addition to all standard layberthing fees. If the vessel is outside the first period, a new layberthing period will begin with the time beginning when the vessel is made fast on the latter berth.

The physical capabilities of the Stolthaven Houston Dock are as follows:

### SHIP DOCKS 2 & 3

| L.O.A. | SHIPS: | 860 Feet Maximum and 375 Feet Minimum |
|---|---|---|
| | BARGE: | 2 Barge Lengths Maximum for #3 Dock |
| | | 1 Barge Length Maximum for #2 Dock |
| BEAM | SHIPS: | 140 Feet |
| | BARGE: | 2 Barge Width Maximum |
| DRAFT | | 40 Feet |

(NO BARGES LEFT UNATTENDED AT ANY TIME)

All alongside barges must obtain prior authorization from the TERMINAL and NO alongside barges are allowed while another vessel is berthing in the common slip area for either dock. The vessel will pay any fees associated with compliance to this requirement. Failure to comply with a two (2) hour notice to vacate the slip on barge alongside operations will result in an additional $5,000.00 (Five Thousand Dollars) per hour charge from the end of the two (2) hour notice period until the slip is vacated plus all ship berthing delay costs and fees for the other services rendered.

BARGE DOCK C:

| | | |
|---|---|---|
| L.O.A. | BARGE: | 300 Feet Maximum |
| BEAM | BARGE: | 2 Barge Width Maximum |
| DRAFT | | 14 Feet |

(NO BARGES LEFT UNATTENDED AT ANY TIME)

Vessel L.O.A. (Length Overall) for size limitations and billing will be based upon the Lloyd's Register of Shipping or if not in the Lloyd's Register, will be based on the ship's Certificate of Register. In cases of dispute, the final decision as to the L.O.A. will always rest with the TERMINAL.

B.     LIGHTERING CHARGES & TERMS:

Any and all lightering operations must be cleared through the TERMINAL Marketing Department to insure all regulatory, safety and cost issues are evaluated prior to cargo vessels arriving at the TERMINAL. While the TERMINAL offers access to the facility for overboard vessel to vessel transfers, the TERMINAL is strictly regulated by State and Federal agencies with reference to operations, safety, vapor emissions, wastewater and residue generation.

The TERMINAL has a Marine Flare at "C" Dock and #2 and #3 Ship Dock due to specific requirements mandated by the TERMINAL's air permit. Lightering operations of specific products, may require vapor recovery to the marine flare. Vessels discharging to barges that require vapor recovery will have to provide cross over piping for vapor hose connections. The TERMINAL will provide vapor hose from dock to vessel. Vessel to barge vapor hose will be the responsibility of the vessel or barge.

Any unauthorized lightering operation conducted at the TERMINAL's docks will result in a minimum additional charge of $5,000.00 (Five Thousand Dollars) per unauthorized lightering. Any additional fines, penalties, fees and the applicable transfer charges will be paid by the responsible party(s) in addition to this $5,000.00 (Five Thousand Dollars) charge; furthermore, no portion of the $5,000.00 (Five Thousand Dollars) will be credited toward any other costs.

When overboard lightering is in progress a close communication with pilots and TERMINAL operations is required, as all operations must stop and the barge must disconnect when another vessel is berthing in the common slip area. (i.e., no overboard at 2 Dock while berthing at 1 Dock and no overboard at 3 Dock while berthing at 4 Dock) Violations will result in a fine of $5,000.00 (Five Thousand Dollars) per hour from the end of the two (2) hour notice period.

The TERMINAL will act in full compliance with the Texas OSPRA and Federal OPA regulations which requires the General Land Office to be called out for any discharges to the waterway, regardless of size, hazard or countermeasure. If the TERMINAL is made liable for a G.L.O. call out fee or any other costs associated with the discharge, these costs will be billed to the vessel or barge owner. These fees will be in addition to all cleanup, response,

demurrage, wharfage and other costs incurred by the TERMINAL as a result of the incident. As the shore facility is required to provide assistance in spill response, an MSDS for the product being lightered must be sent to the TERMINAL before the barge arrives at the facility.

ALL REQUESTS FOR ANY ACTIVITY AND/OR CANCELLATIONS MUST BE RECEIVED IN WRITING PRIOR TO ACTIVITY OCCURRING.

Any barge arriving after the cargo vessel has docked, and with no prior notification or agreement made with SHVNH, will be considered "unauthorized" and will be subject to additional charges as outlined in this tariff.

1.   Direct Board to Board Transfer Fees (Per Product)

| | |
|---|---|
| 0 – 1,000 metric tons | $2.86 |
| 1,001 – 2,500 metric tons | $2.75 |
| 2,501 – 5,000 metric tons | $2.63 |
| > 5,000 metric tons | $2.40 |

A minimum charge of $2,000.00 will apply.  If no shoreside product operations are in progress a layberthing fee will be charged in addition to all other charges.

It will be the responsibility of the vessel, barge company or customer to arrange cargo hoses and hose handling.  Terminal cannot provide hoses or hose handling for lightering operations.

C.   BUNKERING CHARGES & TERMS:

1.   Vessel Bunkering/Gas Oil/Lube Oil via Barge:

| | |
|---|---|
| 0 – 1,000 metric tons | $3.15 |
| 1,001 – 2,500 metric tons | $2.86 |
| 2,501 – 5,000 metric tons | $2.57 |
| > 5,000 metric tons | $2.29 |

A minimum charge of $1100.00 will apply to each marine move.

If no shoreside product operations are in progress a layberthing fee will be charged in addition to all other charges.

It will be the responsibility of the vessel, Barge Company or customer to arrange cargo hoses and hose handling.  Terminal can not provide hoses or hose handling for bunkering operation.

Stolthaven offers no services with respect to overboard-bunker transfers except assistance with dock schedule information.  If another ship is berthing at the dock in

the common slip area, the bunkering must be stopped and the bunker barge must move until the ship's lines are fast. Violations of the two (2) hour notice will result in additional fines as outlined in Section A of this tariff. Stolthaven will not pay any costs for these moves as it comes as a mandate by pilots.

Any barge arriving after the cargo vessel has docked, and with no prior notification or agreement made with SHVNH, will be considered "unauthorized" and will be subject to additional charges as outlined in this tariff.

2.    Bunkering Charges Ex Wharf:

| | |
|---|---|
| 0 – 1,000 metric tons | $5.72 |
| 1,001 – 2,500 metric tons | $5.49 |
| 2,501 – 5,000 metric tons | $5.15 |
| > 5,000 metric tons | $4.58 |

A minimum charge of $1320.00 will apply to each marine move.

If no shoreside product operations are in progress a layberthing fee will be charged in addition to all other charges.

The TERMINAL will act in full compliance with the Texas OSPRA and Federal OPA regulations which requires the General Land Office to be called out for any discharges to the waterway, regardless of size, hazard or countermeasure. If the TERMINAL is made liable for a GLO call out fee or any other costs associated with the discharge, these costs will be billed to the vessel or barge owner. These fees will be in addition to all cleanup, response, demurrage, wharfage and other costs incurred by the TERMINAL as a result of the incident. As the shore facility is required to provide assistance in spill response, an MSDS for the product being transferred must be sent to the TERMINAL before the barge arrives at the facility.

D.    OTHER VESSEL SERVICING CHARGES:

The Stolthaven docks are not designed for vehicular traffic during vessel loading operations. Activities must be handled by barge, shoreline, handcart or Stolthaven Houston mobile equipment. Vehicles are prohibited from the docks at all times without authorization from Stolthaven Houston Management. Any illegally parked vehicles will be removed at the owner's expense.

1.    Manpower Charges:

| | |
|---|---|
| Straight Time: | $58.00 per hour |
| Overtime: | $86.00 per hour |

(All labor rates are subject to a four (4) hour minimum, if manpower is called out)

2.    Equipment:

    a. Lull Fork Lift:                    $290.00 per hour per ship plus manpower ($580.00 minimum)

    b. Stolt Tanker Cargo Cage:        $58.00 per hour ($116.00 minimum)

    c. Stationary Dock Crane:         $290.00 for first hour plus $116.00 per hour for each additional hour

    d. Cherry Picker:                   $580.00 for first hour plus $290.00 per hour for each additional hour

    e. Vacuum Truck:                   $580.00 per hour plus $290.00 per hour for each additional hour

    f. Plant Trucks:                    $90.00 per vehicle plus manpower per hour (1 Hour minimum)

    g. Gangway:                       $580.00 per use of Terminal Gangway

    h. Crew Bus                        $160.00 per vessel call

    i. Filter Set-up
       Large Stainless Steel          $2,750.00 includes cleaning and disposal
       Small Stainless Steel         $700.00 includes cleaning and disposal

    j. Miscellaneous Services        Cost +15%

    k. Additional Invoicing           $25.00 per invoice (1 free per ship)

3.    Service Charges:

All charges listed below are in addition to other service charges and layberthing fees.

    a.    Ship to Tank Truck
         Transfer of Marpol Waste:      $1,000.00 for first truck
                                      $500.00 for each additional truck

         (Trucks must have containment for drips and spills, which must be taken with trucks).

    b.    Stores x barge:               $800.00 per barge

c.    Garbage Disposal from Ships:    Cost plus 15% plus a $350.00 service charge.  Extra equipment charged separately.

Garbage left (dumped) on the dock, by the ship, will be disposed of at the above listed costs, plus an additional $2,500.00.

d.    Wastewater Handling for Vessels/Barges:

On-Site Treatment Facility:    Costs to be quoted

Must be pre-approved through the Wastewater Department as rates will vary with toxicity, concentration and compatibility with system and permit restraints.  ($1,000.00 minimum)

Off-Site Disposal:    Cost plus 15%

e.    Waste/Drum Disposal

Drums    $205.00 for the 1st drum
$60.00 for the 2nd thru 4th drum
$205.00 per drum thereafter

Drum Disposal    $205.00 minimum per drum

*Pricing above may vary depending upon product and drum type.*

f.    Sampling    $35.00 per each

g.    Sample Disposal
Non-Hazardous:    $15.00 sample, $58.00 per man-hour, plus $290.00 Service Charge

Hazardous:    $25.00 sample,   $58.00 per man-hour, plus $290.00 Service Charge

h.    Deionized Water:    $550.00 per truck*

*Charge is for truck handling only. Vessel/Agent to handle all costs associated with transportation, shipping, purchasing and scheduling of water.

i.    Flaring    $390.00 per hour operation
(minimum $585.00)
*Escalated / de-escalated monthly*

4.    UTILITY CHARGES:

    a.    Nitrogen:

| | |
|---|---|
| Ambient Temperature<br>Ex Pipeline | $1.30 per 100 cubic feet |
| Heated to 140°F Max<br>Ex Pipeline (as available)<br>Heated Nitrogen<br>Ex Tank Truck | Cost plus 15% |

*Utilities are escalated / de-escalated on a monthly basis.*

    b.  Potable Water

| | |
|---|---|
| Ex Stolthaven Pipeline | $5.50 per 1,000 gallons<br>($550.00 minimum per loading) |

    c.  Heating

| | |
|---|---|
| Steam | $390.00 per hour |

(Minimum charge is $585.00 per vessel)
*Utilities are escalated / de-escalated on a monthly basis.*

5.    SPILL CONTROL:

    a.

| | |
|---|---|
| Spill Boom Deployment<br>(Overboard Spills) | $5,000.00 minimum<br>(plus man hours) |
| Spill Boom Clean-up and Retrieval | Cost Plus 15% |

    b.    TGLO Call Out      $600.00 minimum

**EXHIBIT B**

DLC/GRW/SNTG
03/18/2008 10:00 AM

To   "Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit.com>
cc   "d.coiley@stolt.com" <d.coiley@stolt.com>, "H - Gerd Mangels" <mail@hiltveit.com>, "s.turchi@stolt.com" <s.turchi@stolt.com>
bcc
Subject   Re: Rachel B

Mr. Hiltveit,

The Rachel B requested the bunkers well after shore operations were concluded and after the US Coast Guard issued detention orders. The layberth/"failure to vacate dock fee" is being billed pursuant to Stolthaven's Marine Tariff, unless the vessel is conducting shore operations. Bunkers, wastewater, etc. are NOT shore operations. Shore operations under the Tariff relate exclusively to Stolthaven's customer products. See Paragraph C(1) of Stolthaven's Tariff, which reads, in relevant part, as follows:

"If no shoreside product operations are in progress a layberthing fee will be charged in addition to all other charges."

Your message only heightens our sense of frustration, and provides further indication of your desire to engage in added delay tactics.

Regards,

Dan Carr
Assistant General Counsel
Stolt-Nielsen USA Inc.
800 Connecticut Avenue
4th Floor East
Norwalk, CT  06854
Tel:  203-299-3795
Fax:  203-299-3698/3918
d.carr@stolt.com
www.stolt-nielsen.com

"Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit.com>



"Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit.com>
03/18/2008 09:09 AM

To   "d.carr@stolt.com" <d.carr@stolt.com>
cc   "H - Gerd Mangels" <mail@hiltveit.com>, "s.turchi@stolt.com" <s.turchi@stolt.com>, "d.coiley@stolt.com" <d.coiley@stolt.com>
Subject   Rachel B

Dear Mr. Carr,

We are doing our best to have this resolved and understand your frustration. But, the terminal have also billed for the time when the ship conducted normal operation, receiving bunkers from the terminal?

Is that justifiable?

Sincerely
Hiltveit Associates Inc.
Carl G. Hiltveit


-----
From: d.carr@stolt.com
Date: Mon, 17 Mar 2008 15:44 -0400 Msg: HAINY-1304528
Subject: Re: Rachel B
To: Hiltveit - H - Carl G. Hiltveit
Cc: H - Gerd Mangels
Cc: s.turchi@stolt.com
Cc: d.coiley@stolt.com

Dear Mr. Hiltveit,

I have conferred with my colleagues in Terminal management with respect to
your below message.  Your message is woefully inadequate.  We are no
longer interested in engaging in discussion.  In short, we are simply not
to be blamed for the condition of the Rachel B, nor are we to be blamed
for the Ship's extended stay at our dock.  Terminal management made
repeated calls to both your Company and your agent, Biehl, urging payment
and that the Ship vacate the dock immediately.  At no time during these
conversations or at any other time, did your Company or your agent request
the assistance of Terminal management to expedite access for ship
repairmen.  A simple phone call to the Terminal Director and/or Manager
would have made all the difference.  We are done with your excuses. Unless
we receive full payment of our invoice by close of business tomorrow, we
will instruct local counsel, who are currently on standby, to proceed with
a vessel arrest and/or take any other measures required to secure our
claim.

Our wire remittance instructions are as follows:

Chase Bank of Texas, N.A.
Name:    StoltHaven Houston, Inc.
Acct:    00101766336
ACH:     111000614
Wire:    021000021
Swift:   CHASUS33

We attach, again, our invoice.


Regards,

Dan Carr
Assistant General Counsel
Stolt-Nielsen USA Inc.
800 Connecticut Avenue
4th Floor East
Norwalk, CT  06854
Tel:  203-299-3795

Fax:  203-299-3698/3918
d.carr@stolt.com
www.stolt-nielsen.com


"Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit.com>
03/14/2008 03:52 PM

To
"d.carr@stolt.com" <d.carr@stolt.com>
cc
"H - Gerd Mangels" <mail@hiltveit.com>
Subject


Dear Dan Carr,

Stolthaven Terminal has received a copy of the Port State detention order from the
U.S. Coast Guard.  We attache  a copy of a Statement of Fact covering the period
the RACHEL B was detained at the Stolthaven Terminal.  We believe that a review of
these documents may help to put the situation into better perspective.

As you know, the Coast Guard found that there were deficiencies in the vessel's
emergency firefighting equipment and prohibited the vessel from leaving the berth
until the deficiencies were resolved.  It was subsequently determined that it would
be necessary to remove the emergency fire pump and  main fire pump from the vessel,
and take it ashore for repair to resolve the problem.

As soon as the vessel was instructed to vacate the berth by the Terminal, prompt
efforts were made to enable the vessel to leave. Arrangements were made to move the
vessel as a dead ship to a lay berth, but permission was refused by the Coast Guard
because of VTS notice requirements.  Moreover, efforts to have the main fire pump
taken ashore for repair and to conduct other remedial repairs were frustrated by
the Terminal's repeated refusal to allow shoreside repair personnel to enter the
terminal to pick up the pump or conduct other required repairs. The Terminal's
actions delayed the necessary repairs and prolonged the time the vessel

was
prevented from leaving the berth.

It should also be noted that the Terminal furnished bunkers and allowed for the
removal of sludge from the vessel while it was under detention and after it was
given notice to leave the berth.

We request that Stolt reassess its position in light of the foregoing. The vessel
interests did all within their power to promptly correct the deficiencies found by
the Coast Guard so that the vessel could leave the berth as it had been requested
to do by the Terminal. However, these efforts were frustrated and delayed by the
Terminal's refusal to allow access by repairmen and other shoreside personnel who
were essential to these efforts. From our point of view, it is unreasonable for
the Terminal to seek to recover damages for the vessel's period of detention, in
particular when also claiming the time delay caused by the Terminal itself.

Hiltveit's vessels call at Stolthaven each and every time they are in Houston.
Hiltveit and Stolt have maintained relations based on trust and fair dealing. In
this spirit, we trust that Stolt will reassess its current position.

Sincerely
Hiltveit Associates Inc.
Carl G. Hiltveit

PLEASE NOTE: The information contained in this message is confidential, and in
some instances legally privileged, and is intended only for the use of the
individual(s) named above. If you are not the intended recipient(s), you are
hereby notified that any dissemination, distribution or copying of this message
is strictly prohibited. If you received this communication in error, or if any
problems occur with transmission, please immediately notify the sender. Thank
you.

DLC/GRW/SNTG
03/17/2008 02:44 PM

To   "Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit com>

cc   "H - Gerd Mangels" <mail@hiltveit.com>,
     TUR/SHVH/SNTG@SNTG, DCA/SHVH/SNTG@SNTG

bcc

Subject   Re: Rachel B 

Dear Mr. Hiltveit,

I have conferred with my colleagues in Terminal management with respect to your below message. Your message is woefully inadequate. We are no longer interested in engaging in discussion. In short, we are simply not to be blamed for the condition of the Rachel B, nor are we to be blamed for the Ship's extended stay at our dock. Terminal management made repeated calls to both your Company and your agent, Biehl, urging payment and that the Ship vacate the dock immediately. At no time during these conversations or at any other time, did your Company or your agent request the assistance of Terminal management to expedite access for ship repairmen. A simple phone call to the Terminal Director and/or Manager would have made all the difference. We are done with your excuses. Unless we receive full payment of our invoice by close of business tomorrow, we will instruct local counsel, who are currently on standby, to proceed with a vessel arrest and/or take any other measures required to secure our claim.

Our wire remittance instructions are as follows:

Chase Bank of Texas, N.A.
Name:  StoltHaven Houston, Inc.
Acct:   00101766336
ACH:   111000614
Wire:   021000021
Swift:  CHASUS33

We attach, again, our invoice.



Legal_0317193033_001.pdf

Regards,

Dan Carr
Assistant General Counsel
Stolt-Nielsen USA Inc.
800 Connecticut Avenue
4th Floor East
Norwalk, CT  06854
Tel:  203-299-3795
Fax:  203-299-3698/3918
d.carr@stolt com
www.stolt-nielsen.com

"Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit.com>

"Hiltveit - H - Carl G. Hiltveit"
<cgh@hiltveit.com>
03/14/2008 03:52 PM

To   "d.carr@stolt.com" <d carr@stolt.com>

cc   "H - Gerd Mangels" <mail@hiltveit com>



Subject

Dear Dan Carr,

Stolthaven Terminal has received a copy of the Port State detention order from the
U.S. Coast Guard. We attache a copy of a Statement of Fact covering the period
the RACHEL B was detained at the Stolthaven Terminal. We believe that a review of
these documents may help to put the situation into better perspective.

As you know, the Coast Guard found that there were deficiencies in the vessel's
emergency firefighting equipment and prohibited the vessel from leaving the berth
until the deficiencies were resolved. It was subsequently determined that it would
be necessary to remove the emergency fire pump and main fire pump from the vessel
and take it ashore for repair to resolve the problem.

As soon as the vessel was instructed to vacate the berth by the Terminal, prompt
efforts were made to enable the vessel to leave. Arrangements were made to move the
vessel as a dead ship to a lay berth, but permission was refused by the Coast Guard
because of VTS notice requirements. Moreover, efforts to have the main fire pump
taken ashore for repair and to conduct other remedial repairs were frustrated by
the Terminal's repeated refusal to allow shoreside repair personnel to enter the
terminal to pick up the pump or conduct other required repairs. The Terminal's
actions delayed the necessary repairs and prolonged the time the vessel was
prevented from leaving the berth.

It should also be noted that the Terminal furnished bunkers and allowed for the
removal of sludge from the vessel while it was under detention and after it was
given notice to leave the berth.

We request that Stolt reassess its position in light of the foregoing. The vessel
interests did all within their power to promptly correct the deficiencies found by
the Coast Guard so that the vessel could leave the berth as it had been requested
to do by the Terminal. However, these efforts were frustrated and delayed by the
Terminal's refusal to allow access by repairmen and other shoreside personnel who

were essential to these efforts. From our point of view, it is unreasonable for
the Terminal to seek to recover damages for the vessel's period of detention, in
particular when also claiming the time delay caused by the Terminal itself.

Hiltveit's vessels call at Stolthaven each and every time they are in Houston.
Hiltveit and Stolt have maintained relations based on trust and fair dealing. In
this spirit, we trust that Stolt will reassess its current position.

Sincerely
Hiltveit Associates Inc.
Carl G. Hiltveit

STATEMENT OF FACTS HOUSTON - Stolt sent doc

 **Stolthaven Houston Inc.**

*15602 Jacintoport Boulevard, Houston, TX 77015    281-860-6800*

\*\*Original Invoice\*\* - Please accept
our apologies! Our invoicing
stationery is on back order!

| | |
|---|---|
| Please Remit To:        01 | Wire/ACH: |
| P.O. Box 201680 | Chase Bank of Texas, N A |
| Houston, TX 77216-1680 | Acct: 00101766336 |
| | ABA 113000609 |

Page:                                1
Invoice Date:              3/01/08
Invoice Number:      393767-04100

To: Hiltveit Associates, Inc.
    Hauppauge Corporate Center, Suite 302
    150 Motor Parkway
    Hauppauge, NY 11788   US

Contract .....      803-02334

Activity Ending    3/15/08

Invoice Total            $269,754 38 USD

| Description of Services | Quantity | U/M | Rate | Amount |
|---|---|---|---|---|
| LAYBERTH 12HR (1ST) | 433.000 | FT | 4.860000 | 2,104.38 |
| LAYBERTH 12hr (2ND) | 1 000 | MIN | 1,325.000000 | 1,325 00 |
| LAYBERTH 12hr (3RD) | 1 000 | MIN | 1,325 000000 | 1,325 00 |
| DOCK VACATE PENALTY | 53.000 | HR | 5,000 000000 | 265,000 00 |

General Invoice Notes ..
    Work Order #: 0803-38167
    RACHEL B
U.S. COAST GUARD DETENTION AT STOLHAVEN HOUSTON
MARCH 4, 2008

Terms:          Due upon Receipt

THANK YOU

| | |
|---|---|
| Subtotal | $269,754 38 |
| Sales Tax | $.00 |
| Total | $269,754 38 USD |

STOLTHAVEN HOUSTON INC.
15602 JACINTOPORT BOULEVARD
HOUSTON, TX 77015

(281) 860-6842

FILE COPY

Page                    1

Invoice Date        3/01/08

Invoice Number     393767-04100

TO:    Hiltveit Associates, Inc.
       Hauppauge Corporate Center, Suite 302
       150 Motor Parkway
       Hauppauge, NY  11788  US

| Contract...... . | 803-02334 |
| Activity Ending | 3/15/08 |
| Invoice Total . | $269,754.38 USD |

| Description of Services | Quantity | UOM | Rate | Amount |
|---|---|---|---|---|
| LAYBERTH 12hr (1ST) | 433.000 | FT | 4.860000 | 2,104.38 |
| LAYBERTH 12hr (2ND) | 1.000 | MIN | 1,325.000000 | 1,325.00 |
| LAYBERTH 12hr (3RD) | 1.000 | MIN | 1,325.000000 | 1,325.00 |
| DOCK VACATE PENTALTY | 53.000 | HR | 5,000.000000 | 265,000.00 |

General Invoice Notes  ..
   Work Order #: 0803-38167
RACHEL B
U.S COAST GUARD DETENTION AT STOLHAVEN HOUSTON
MARCH 4, 2008

Terms:   Due upon Receipt

| Subtotal | $269,754.38 |
| Sales Tax | $.00 |
| Tot V | $269,754.38 USD |

```
Invoice     393767-04100              STOLTHAVEN HOUSTON INC                    Page    1
Inv Date    3/01/08                   Invoice Backup Report
```

```
Hiltveit Associates, Inc          Contract   803-02334
Product...Activity.... Tank... Bill Quantity...... UOM Billing Rate..... Tax Amount.......... Invoice Amount.......
MISCELLANEOUS .
      LAYBERTH 12hr (1ST)          433.000   FT      4.860000              .00          2,104 38
      LAYBERTH 12hr (2ND)            1 000   MIN  1,325.000000              00           1,325 00
      LAYBERTH 12hr (3RD)            1 000   MIN  1,325 000000              00           1,325 00
      DOCK VACATE PENALTY          53 000    HR   5,000 000000             00         265,000.00

                                                            Subtotal       00         269,754 38

                                                            Invoice Total  00         269,754 38
```

}                                                }

| DLC/GRW/SNTG | To | "Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit.com> |
| 03/10/2008 04:53 PM | cc | "d.coiley@stolt.com" <d.coiley@stolt.com>, "mail@hiltveit.com" <mail@hiltveit.com>, "s.turchi@stolt.com" <s.turchi@stolt.com> |
| | bcc | |
| | Subject | Re: Rachel B - Stolthaven Houston - USCG Detention |

Dear Mr. Hiltveit,

Thank you for yours. I understand that the Rachel B departed Stolthaven's dock at 2200 on March 7. While we appreciate your efforts in gaining her release from the dock, Stolthaven expects to be compensated in accordance with the Terminal's published Marine Tariff (2007). We attach Stolthaven's invoice totaling USD 269,754.38 together with accompanying supports  This sum is due upon receipt.

  

Hiltveit 393767 pdf   Backup.pdf

Regards,

Dan Carr
Assistant General Counsel
Stolt-Nielsen USA Inc.
800 Connecticut Avenue
4th Floor East
Norwalk, CT  06854
Tel:  203-299-3795
Fax:  203-299-3698/3918
d.carr@stolt.com
www.stolt-nielsen.com
"Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit.com>



| "Hiltveit - H - Carl G. Hiltveit" <cgh@hiltveit.com> | To | "d.carr@stolt.com" <d.carr@stolt.com> |
| 03/07/2008 06:19 PM | cc | "mail@hiltveit.com" <mail@hiltveit.com>, "s.turchi@stolt.com" <s.turchi@stolt.com>, "d.coiley@stolt.com" <d.coiley@stolt.com> |
| | Subject | Rachel B - Stolthaven Houston - USCG Detention |

Dear Mr. Carr,

This with reference to telephone conversation regarding the Rachel B at Stolthaven in Houston, please be advised that the ship has been released in all
regards by USCG.

We trust this evidence that on behalf of owners of Rachel B we did do everything

possible to complete the necessary corrective measures.

We would like to say that we had not previously seen, nor are we familiar with the terms of the Stolthaven Marine Tariff (2007).

We regret the situation and would like to review the case with you so we can come to a fair and correct resolution.


Sincerely
Hiltveit Associates Inc.
Carl G. Hiltveit
President


-----
From: d.carr@stolt.com
Date: Fri, 7 Mar 2008 14:15 -0500 Msg: HAINY-1301555
Subject: Rachel B - Stolthaven Houston - USCG Detention
To: mail@hiltveit.com
Cc: s.turchi@stolt.com
Cc: d.coiley@stolt.com

Attention:  Dominick Cassataro

Please see the attached letter from Stolt's Legal Department.


Regards,

Dan Carr
Assistant General Counsel
Stolt-Nielsen USA Inc.
800 Connecticut Avenue
4th Floor East
Norwalk, CT  06854
Tel:  203-299-3795
Fax:  203-299-3698/3918
d.carr@stolt.com
www.stolt-nielsen.com

CONFIDENTIAL NOTICE:  The information contained in this message is confidential,
and in some instances legally privileged, and is intended only for the use of the individuals named above.
If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If you received this communication in error, or if any problems occur with transmission, please notify us immediately by return email for the return of this transmission.  Thank you.

# Stolt-Nielsen USA Inc.



| | | |
|---|---|---|
| A subsidiary of<br>Stolt-Nielsen S A | Stolt Tankers and Terminals<br>800 Connecticut Avenue<br>4th Floor East<br>Norwalk, Connecticut 06854<br>U S A | Direct:    + 1 203 299-3795<br>Fax:      + 1 203 299-3698<br>Dept Fax: + 1 203 299-3918<br>www.stolt-nielsen.com<br>e-mail: d carr@stolt com |

BY E-MAIL

March 7, 2008

Dominick A. Cassataro
Hiltveit Associates Inc.
Hauppauge, New York
Email:   mail@hiltveit com

## WITHOUT PREJUDICE

### RACHEL B
### U.S. Coast Guard Detention at Stolthaven Houston
### March 4, 2008

Dear Mr. Cassataro:

I am Assistant General Counsel of Stolt-Nielsen USA Inc. and write on behalf of Stolthaven Houston Inc  The above matter has been referred to the undersigned for further handling as it relates to protecting Stolthaven's legal interests  I have been asked to respond to your e-mail of March 6, 2008.

The U.S. Coast Guard has detained the Rachel B for various deficiencies.  The causes, excuses and reasons for the detention are of no concern to us.  This is of the Owners' making, not ours, not the U.S. Coast Guard.  We expect you to appreciate that through no fault of our own we are incurring serious financial harm by the vessel's ongoing presence at our dock.

Stolthaven's Marine Tariff (2007) was distributed to your agents many months ago.  Owners' knowledge is imputed through the knowledge of your agents.  We refer you to Stolthaven's Marine Tariff and in particular to paragraph 2, page 3, which reads:  *"Upon receipt of four (4) hours notice for ships and two (2) hours notice for barges, the TERMINAL dock shall be promptly vacated at the vessel's expense. Failure to comply with the TERMINAL's vacant rule can result in an additional $5,000 per hour charge from the end of the notice period until the dock is vacated  Vessel must be cargo ready upon arrival  If not, layberth will start incurring "* At 1300hrs LI on March 5, 2008 we issued notice to Owners to vacate the berth, citing paragraph 2, Layberth Charges of Stolthaven's Marine Tariff.  Subject to review of our extraordinary costs, Owners can expect our invoice to be assessed on this basis.  Therefore, if the vessel vacates the berth on March 8, Owners can expect an invoice in excess of $300,000  We

Dominick A. Cassataro
Hiltveit Associates Inc.
March 7, 2008
Page 2

expect full and prompt payment of such layberth charges and reserve the right to claim any
additional damages, losses and expenses, as permitted under the law and at equity   Upon
departure of the Rachel B, we will invoice Owners pursuant to the Tariff and accumulate our
extraordinary costs and submit a claim to Owners for compensation.

We expect compensation to be made to Stolthaven Houston within 24-48 hours of submission.
Absent payment, we will require Owners to post security in a form acceptable to Stolthaven.  We
encourage Owners to cooperate in negotiating a speedy resolution in addressing our costs, either
through payment or through an acceptable form of security.   Failing which, we have local
counsel on standby with instructions to proceed with a vessel arrest or take any other measures
required to secure our claim.  We trust this will not be necessary.

Very truly yours,

Daniel Carr
Assistant General Counsel


Copy:  Capt David Coiley -- Stolthaven Houston
       Stephen Turchi -- Stolthaven Houston

# EXHIBIT C



# COI

## About COI

Central Office of Information was established in 1946 after the demise of the wartime Ministry of Information, when individual government departments resumed responsibility for information policy.

## Aim

The aim of COI is to enable central government and public sector bodies to secure policy objectives through achieving maximum communication effectiveness and best value for money.

## Objectives

COI's objectives are to improve the effectiveness of and add value to government publicity programmes. COI achieves this through consultancy, procurement and project management services across all communication channels.

## Accountability

COI's Chief Executive reports to the Minister for the Cabinet Office. The Minister is accountable to Parliament and its Select Committees for all COI's activities. The Minister also sets COI's annual objectives for efficiency, quality and financial performance.

---

This page was printed from the COI website at 23:34 on Thursday, 12 Jun 2008. It is subject to © Crown Copyright.

Thursday 12 June 2008

**National News**

**Regional News**

**North East**

**North West**

**Yorkshire and the Humber**

**East Midlands**

**West Midlands**

**East**

**London**

**South East**

**South West**

**Scotland**

**Wales**

**Northern Ireland**

**Department News**

Home > South West > Chemical tanker detained after inspection

**South West**

**back**



Marit me and Coastguard Agency

Thursday 1 May 2008 12:32
**Maritime And Coastguard Agency (South West)**

**Chemical tanker detained after inspection**

Maritime and Coastguard Agency surveyors from Falmouth Marine Office after being alerted to the vessel by the Harbourmaster, detained the Liberian flagged 'Rachel B' chemical tanker at Falmouth on Monday after numerous faults were identified on board not in accordance with International Safety Management (ISM).

After discussions with the vessel's owners and flag state it was decided that the vessel would be allowed to remain in Falmouth for a short time whilst repairs were undertaken and recommendations from the inspection attended to. Once any deficiencies are corrected the tanker will again be presented to Maritime and Coastguard Agency surveyors who will decide whether the vessel is safe to continue on its voyage.

The tanker was built in 1987 and falls under the American Bureau of Shipping classification. It is 117 metres in length and 7955 Gross Tonnes.

Tony Heslop, Surveyor in Charge from the MCA's Plymouth office said:

"The owners of the vessel, Zarepta Chemical KS in Norway have been informed of the decision to detain this vessel.

All shipping is under an obligation to conform to international legislation.

The Maritime and Coastguard take shipping safety extremely seriously, and we will not allow vessels to traverse our waters where clearly international standards of safety are being breached."

Press releases and further information about the Agency is available on the Web at http://www.mcga.gov.uk

Client ref Press Notice No: 111-08

COI ref 160419P



Search t

**Advanced**

Log on for p
news and inf

Username :

Password :

☐ Remem

Log in

Forgotten pa

Sign up

Download T



Download ev
this page (ZI
**Get WinZip**

Related Item

Chemical tan
after inspecti

download (37



Department news  |  National news  |  Regional news  |  Directgov

Privacy policy  |  Disclaimer  |  Printer-friendly version  |  Accessibilty

Hc  **Photograph f
vessel Rache**

**download (8**

**EXHIBIT D**





Part of the This Is The West

| Home Page | Site Map | Search | Advance |

Today's most viewed

<<Back to most read

**Local & National News**

**Local & National Sport**

**Jobs**

**Homes**

**Cars, bikes, boats**

**Events & entertainment**

**What's On**

**South West Exchange & Mart**

**Weather & Shipping**

**Features**

**Tourism**

**Useful info**

**Local Information**

**Letters & Comment**

**Family Announcements**

**CommuniGate**

**Book an advert**

**Local Dating**

**Archive**

**Subscribe**

**Contact Us**

## Tanker described as an "oily mess" detained in Falmouth

A chemical tanker described as an "oily mess" was detained by the Marine and Coastguard Agency in Falmouth last week.



*The engine room of the Rachel B*

The Liberian registered Rachel B was boarded and checked after surveyors from the MCA's Falmouth marine office were tipped off by Falmouth harbourmaster, Captain Mark Sansom.

The 117 metre long, 7955 ton tanker was detained after an array of faults "not in accordance with international safety management" were found.

A MCA spokesman said the faults were mainly in the vessel's engine room and called it "an oily mess with corroded pipes, faulty and broken gauges and pumps".

He added after discussions with the vessel owners, Zarepta Chemical KS in Norway, and its flag state, they decided that the vessel would be allowed to remain in Falmouth for a short time.

This was so repairs could be carried out and recommendations from the surveyors' inspection dealt with.

The tanker was re-inspected by surveyors on Friday, May 2 and the MCA will decide whether it is safe to continue on its voyage.

The spokesman said while the state of the vessel caused concern particularly as it was carrying a cargo of chemicals, there was no danger to the environment.

Tony Heslop, MCA area operations manager for the South West said: "The owners of the vessel, have been informed of the decision to detain this vessel.

"All shipping is under an obligation to conform to international legislation."

**EDITOR'S CHOICE**

**MUSIC**



- For One Night only at the Pavilions

The Packet's Priceless Portraits is being held soon. Have your child photographed for free. Full details in Wednesday's issue of the Packet

Add your own event to our listings page **Click here**

**Tracing your family roots.** A page dedicated for those wanting to trace their family roots. Contacting relatives from across the world can be easy. Why not join our forum? **Click here**

**GET OUR NEWS BY E-MAIL**

- Just register

| Most read | Comments |
|---|---|
| 1 | Popular Penryn postman dies |
| 2 | Beach party is broken up |
| 3 | Flat residents are living in fear |
| 4 | Driver to be called to girl's inquest |
| 5 | Award nomination for Penryn business woman |
| 6 | Fishing vessel owners fined following Falmouth pollution case |
| 7 | Discovered summerhouse takes pride of place at garden open day |
| 8 | Emergency aid rushed from Helston to Burma |
| 9 | Cornwall's maternity services rated one of best in UK |





He added the MCA take shipping safety extremely seriously and would not allow vessels to traverse UK waters when international standards of safety are clearly being breached.

**10  Helston police disrupt rave**

**Today | 7 Days**

1:54pm Monday 5th May 2008

**Print**   **Email this**

Share this: **Digg | del.icio.us | Furl | reddit | Facebook | Yahoo! | What's this?**

**Archive** [_____]   [ Search ]