USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/18/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
STOLTHAVEN HOUSTON, INC.,

                Plaintiff,              08 Civ. 4327 (RPP)

    - against -                   **OPINION & ORDER**

RACHEL B, its engines, tackle, apparel, etc., *in rem*,
and HILTVEIT ASSOCIATES, INC. and
ZAREPTA CHEMICAL KS, *in personam*,

                Defendants.
----------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       Defendant Zarepta Chemical KS ("Zarepta") moves to vacate this Court's Ex Parte Order for Process of Maritime Attachment dated May 7, 2008, pursuant to Supplemental Rule E(4)(f) to the Federal Rules of Civil Procedure. For the reasons given below, Zarepta's motion to vacate the maritime attachment (Doc. No. 4) is granted, and attorneys' fees are awarded to Zarepta.

**BACKGROUND**

       Plaintiff Stolthaven Houston, Inc. ("Plaintiff") is an affiliate company of Stolt Nielsen USA Inc. ("Stolt Nielsen"), a marine terminal and transportation group. On May 7, 2008, Plaintiff brought a maritime action against the Rachel B ("the Vessel"), *in rem*, and against Hiltveit Associates, Inc. ("Hiltveit") and Zarepta, *in personam*, and sought to attach the assets of Zarepta as security in respect to its claim for unpaid marine services. In naming the parties, the complaint stated that the "M/T Rachel B was and now is a merchant tank vessel owned, operated, and managed by Hiltveit Associates, Inc. and/or

Zarepta Chemical KS." (Compl. ¶ 4.) It identified Hiltveit as a New York corporation with a principal place of business in Hauppauge, New York, and as the manager of the M/T Rachel B. (Id. ¶ 6.) It identified Zarepta as a foreign corporation with a principal place of business in Oslo, Norway, and as the registered owner of the M/T Rachel B. (Id.)

The complaint alleged that beginning on March 4, 2008, Plaintiff provided terminal services to the Vessel in the Port of Houston. (Compl. ¶ 7.) While berthed at Plaintiff's dock, the Vessel was detained by the United States Coast Guard to undergo repairs for various safety deficiencies, during which time Plaintiff was prevented from serving its next vessel. (Id. ¶ 7; see also Carr Decl. ¶ 3.) The Vessel did not vacate the berth until approximately 2200 hours on March 7, 2008. (Compl. ¶ 7.) Plaintiff attached to the complaint a copy of its Marine Tariff (2007), pursuant to which the failure to vacate Plaintiff's dock results in an additional $5,000.00 per hour charge. (Id., Ex. A at 3.) Plaintiff also attached a copy of its email exchange with the president of Hiltveit dated March 5-6, 2008, in which Plaintiff advised Hiltveit to vacate the berth or else incur layberth charges of an additional $5,000.00 per hour pursuant to the Marine Tariff. (Id., Ex. B at 2 of 3.) According to the invoice Plaintiff sent to Hiltveit, the Vessel did not vacate the berth until at least 53 hours later. (Id., Ex. C.) The complaint alleged that Plaintiff "made demand for payment upon Defendants," but none of the amounts due have been paid. (Id. ¶ 11.)

In support of its application for a maritime attachment, Plaintiff alleged that Zarepta could not be found within this district and requested attachment of any assets of Zarepta found within this district. (Id. ¶ 13.) Based on the complaint and the attached

exhibits, this Court issued an ex parte Order for Process of Maritime Attachment of Zarepta's assets in the amount of $318,310.17, pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to the Federal Rules of Civil Procedure.

Following the attachment of Zarepta's assets, Zarepta's counsel sent a letter to Plaintiff's counsel dated June 5, 2008, explaining that Zarepta had entered into a bareboat charter for the Vessel dated May 25, 2004. (Honan Aff. ¶ 4, Ex. D.) The bareboat charterer was Norfolk L.P. ("Norfolk"), through Norfolk's general partner, Hiltveit. (Id.) Zarepta's counsel advised Plaintiff that it therefore had no *in personam* claim against Zarepta and requested that Plaintiff release the attached funds. (Id., Ex. D.) By email dated June 9, 2008, Plaintiff declined to release the attached funds. (Id., Ex. E.)

On June 12, 2008, Zarepta sought an order to show cause as to why the maritime attachment order should not be vacated. In support of its motion, Zarepta included a declaration of Morten E. Werring, Chairman of Zarepta, and attached a copy of the "bareboat charter" for the Vessel dated May 25, 2004 and signed by Zarepta and Hiltveit on behalf of Norfolk, the charterer. Pursuant to the bareboat charter party, the initial period for the charter was eight years, starting from the delivery date. (Id., Ex. A (Bareboat Charter) Rider ¶ 34(b)(i).) The Werring declaration stated that the Vessel was delivered to Norfolk, a limited partnership organized under the laws of the Republic of the Marshall Islands, on May 28, 2004. (Werring Decl. ¶¶ 3, 4.)

The bareboat charter between Zarepta and Norfolk/Hiltveit is comprised of a "BARECON 89" Standard Bareboat Charter (the "Barecon 89"), which is a form bareboat charter printed by the authority of The Baltic and International Maritime

3

Council (BIMCO), as well as a rider providing twenty-four additional clauses. (See Werring Decl., Ex. A.) Certain clauses in the Barecon 89 were visibly modified and agreed to as such by the parties.[1] Clause 9(a) of the Barecon 89 provides, "The Vessel shall during the Charter period be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect." (Id., Ex. A, Barecon 89 ¶ 9(a).) Clause 9(b), which remains unmodified in its entirety, provides as follows:

> (b) The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and repair the Vessel whenever required during the Charter period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including any foreign general municipality and/or state taxes.

(Id., ¶ 9(b).)

The additional clauses in the rider generally replace or supplement clauses in the Barecon 89. Additional Clause 47 governs "Undertakings" of the charterers, a subject not covered by the Barecon 89. (Id., Ex. A, Rider ¶ 47.) Pursuant to this clause, Norfolk agreed to

> (d) enter into a technical management agreement with Hiltveit Associates, Inc. (the 'Managers'), which shall be approved by the Owners [i.e., Zarepta], and not, without the prior written consent of the Owners (such consent not to be unreasonably withheld), dismiss the Manager, alter the Management Agreement or appoint a new manager for the Vessel; . . . .

(Id. ¶ 47(d).) Also in Additional Clause 47, Norfolk agreed not to change its business in any material respect without the prior written consent of Zarepta, and agreed to maintain

---

[1] The bottom of each page of the "BARECON 89" Standard Bareboat Charter reads as follows: "This document is a computer generated BARECON 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. . . ." (See Werring Decl., Ex. A.)

4

a pledged amount of $4 million deposited in a bank account in favor of the mortgagee and Zarepta, $500,000 of which Norfolk could use, subject to the consent of the mortgagee and Zarepta, for operation of the Vessel. (Id. ¶ 47(g),(h).)

In opposition to Zarepta's motion to vacate the attachment, Plaintiff submitted the declaration of Daniel Carr, assistant general counsel of Stolt Nielsen, and the email communications between Mr. Carr, on behalf of Plaintiff, and Hiltveit regarding the layberth charges.[2] By email dated March 7, 2008, Mr. Carr transmitted a letter to Hiltveit advising that Plaintiff intended to assess layberth charges in excess of $300,000 pursuant to Plaintiff's Marine Tariff. (Carr Decl., Ex B.) Hiltveit responded by email the same day, advising Mr. Carr that the Vessel had been released by the Coast Guard and "that on behalf of owners of Rachel B we did do everything possible to complete the necessary corrective measures." (Id.) By email dated March 10, 2008, Mr. Carr transmitted to Hiltveit Plaintiff's invoice for layberth charges totaling $269,754.38. (Id.) Hiltveit responded by email on March 14, 2008, requesting that "Stolt reassess its position" in light of the fact that "[t]he vessel interests did all within their power to promptly correct the deficiencies found by the Coast Guard so that the vessel could leave the berth . . . ." (Id.)

On June 16, 2008, the Court held a Rule E(4)(f) hearing on Zarepta's motion to vacate the attachment. Following the hearing, Zarepta's counsel provided the Court with a copy of the General Management Agreement, dated May 27, 2004, by which Norfolk

---

[2] The Carr declaration also discusses and attaches exhibits pertaining to a subsequent detention of the Rachel B in late April, early May 2008, by the United Kingdom's Marine and Coast Guard Agency (the "MCA"), while the Rachel B was calling at Falmouth. (Carr Decl. ¶¶ 8-9, Ex. D.) Carr states that reports of the incident in the trade press indicated that the MCA had direct discussions with Zarepta and made no mention of a bareboat charter. (Id. ¶ 9.) He asserts that this information was made known to him prior to filing the Rule B attachment proceedings. (Id.) While this evidence is relevant to what Plaintiff knew at the time of filing the complaint and obtaining the maritime attachment, it is not reliable evidence for this Court's determination of whether Plaintiff can sustain a prima facie admiralty case.

5

appointed Hiltveit as general managing agent of the Vessel, and a copy of the Agreement for Ship Management (or Technical Management Agreement), dated May 27, 2004, by which Hiltveit appointed Carl Olsens Tankrederi A/S as technical managers.

## DISCUSSION

A district court should issue the special remedy of a maritime attachment where a plaintiff, in addition to meeting the filing and service requirements of Supplemental Rules B and E to the Federal Rules of Civil Procedure, can show the following:

> 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment.

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 435 (2d Cir. 2006). To avoid abuse of this maritime remedy, Supplemental Rule E(4)(f) provides any person claiming an interest in the attached property with "a prompt hearing at which the plaintiff shall be required to show why . . . attachment should not be vacated or other relief granted consistent with these rules." Fed. R. Civ. P. Supp. R. E(4)(f). At the conclusion of a Rule E(4)(f) hearing, "a district court must vacate an attachment if the plaintiff fails to sustain its burden of showing that he has satisfied the requirements of Rules B and E." Aqua Stoli, 460 F.3d at 445.

Importantly, "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with in the requirements of Rules B and E." Id. at 445 n.5. In determining whether or not the plaintiff has sustained its burden, the majority of courts interpreting Aqua Stoli in this district apply a prima facie pleading standard. Ronda Ship Mgmt. Inc. v. Doha Asian Games Organising Comm.,

6

511 F. Supp. 2d 399, 403 (S.D.N.Y. 2007) ("The majority of courts in this district have understood Aqua Stoli to require the application of the prima facie standard when considering the adequacy of a claim in a maritime vacatur motion."); OGI Oceangate Trans. Co. v. RP Logistics Pvt. Ltd., No. 06 Civ. 9441, 2007 WL 1834711, at *4 (S.D.N.Y. June 26, 2007). A plaintiff is "not required to provide evidence showing that it has a claim against defendant to carry its burden under Supplemental Rule E(4)(f)," and its complaint may suffice. Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 95870, at *16-17 (S.D.N.Y. Aug. 15, 2006). But a plaintiff must state a "valid prima facie admiralty claim" to support a Rule B attachment. Sonito Shipping Co. v. Sun United Maritime Ltd., 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007).

Zarepta challenges Plaintiff's Rule B attachment primarily on the grounds that Plaintiff fails to sustain its burden of showing a valid prima facie admiralty claim against Zarepta in view of the bareboat charter, evidence of which was not presented to the Court with the complaint at the time the attachment was issued. Zarepta asserts that by entering into the bareboat charter with Norfolk/Hiltveit, Zarepta explicitly shifted full responsibility to the charterer for any costs and expenses, including the layberth charges incurred by Hiltveit in March 2008. In response, Plaintiff argues that the so-called bareboat charter does not, in fact, relieve Zarepta of *in personam* liability because it expressly retains Zarepta's control of the Vessel and is therefore not a true bareboat or "demise" charter.

There is no dispute between the parties that a true bareboat charter shifts responsibility for any costs incurred from the owner of the ship to the charterer. (Pl.'s Mem. Law Opp'n at 6; Def.'s Mem. Law Supp. Mot. to Vacate at 6.) See Sampson

Madeja v. Olympic Packers, LLC, 310 F.3d 628, 638 (9th Cir. 2002) (holding that only the bareboat charterer is liable *in personam* for seamen's wage claims in view of the valid bareboat charter agreement). Both parties further agree that the unamended Barecon 89 is a valid bareboat charter. (6/16/08 Tr. at 30-31.) A dispute exists, however, as to the law governing the Court's construction of the charter in this case. Zarepta argues that the charter should be construed in accordance with Norwegian law, such as the parties agreed in Additional Clause ¶ 56 of the charter agreement. (Werring Decl., Ex. A, Rider ¶ 56.) Plaintiff objects to the application of Norwegian law on the grounds that Zarepta gave improper notice of foreign law under Rule 44.1 of the Federal Rules of Civil Procedure by citing foreign law on a reply submission. Zarepta's notice of foreign law was indeed untimely. Plaintiff, however, has not been prejudiced by the untimely notice, as it was granted the opportunity fully to address the issue in sur-reply. Regardless, the result under Norwegian and U.S. law is the same in this case.

Under Norwegian law, the charter made between Zarepta and Norfolk/Hiltveit is certainly a bareboat charter. The Court accepts the unequivocal opinion of Knut Erik Westad, a Norwegian lawyer with many years of maritime law experience, in his declaration on behalf of Zarepta. (Def.'s Reply Mem. Supp. Mot. Vacate, Westad Decl. ¶ 6 (stating "there is, in my opinion, no doubt that under Norwegian law, the Bareboat Charter is in fact a bareboat charter").) Gaute Gjelsten, a Norwegian lawyer who submitted a declaration on behalf of Plaintiff, does not contradict Mr. Westad's opinion that the bareboat charter is a true bareboat charter. Mr. Gjelsten's declaration merely states, "The characterisation of a charter party depends on an assessment of the contract

8

as a whole where the parties' intentions are given significant weight." (Pl.'s Sur-Reply Mem. Law Opp'n, Gjelsten Decl. ¶ 11.)

Under United States law, there is an important distinction between a bareboat charter and a time charter. In characterizing a bareboat or demise charter, the Supreme Court has stated,

> To create a demise the owner of the vessel must completely and exclusively relinquish "possession, command, and navigation" thereof to the demisee . . . . It is therefore tantamount to, though just short of, an outright transfer of ownership. However, anything short of such complete transfer is a time or voyage charter party or not a charter party at all.

Guzman v. Pichirilo, 369 U.S. 698, 699 (1962); see also Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S, 943 F.2d 220, 221 n.2 (2d Cir. 1991) (stating "a demise, or 'bareboat charter,' is the 'transfer of full possession and control of the vessel for the period covered by the contract'" (citation omitted)). Because the owner of the vessel "giv[es] up to the charterers the full possession and control of the ship, it is usually an integral feature of the arrangement that the responsibility for the maintenance and operation and all costs and expenses relating thereto shall be borne by the charterers." Mark Davis, Bareboat Charters 54 (2d ed. 2005). While the transfer of responsibility to the charterer for any costs and expenses can be a tell tale sign of a bareboat charter, "the question whether the possession and control is transferred to the charterer must be determined by the intention of the parties as expressed by the wording of the contract as a whole." Zabriskie v. City of New York, 160 F. 235, 237 (S.D.N.Y. 1908).

Based on the evidence of the intention of the parties and the wording of the charter as a whole, the Court concludes that the Zarepta-Norfolk/Hiltveit charter is a true bareboat charter. To begin, Barecon 89 Clause 9 provides the charterer, Norfolk, with

9

"full possession" and "complete control in every respect" of the Vessel. (Werring Decl., Ex. A, Barecon 89 ¶ 9(a).) In keeping with that broad transfer of control, the charterer also assumes full responsibility for the navigation, operation, supply, fuel, and repair of the Vessel and for all costs associated therewith. (Id., Barecon 89 ¶ 9(b).) As Plaintiff concedes by accepting the unamended Barecon 89 as a true bareboat charter, a registered owner properly may retain some modicum of oversight of the vessel in a bareboat charter party, since a bareboat charter is, after all, a lease and not a complete transfer of title. Here, the Barecon 89 retains Zarepta's right to inspect the Vessel and its log books (Clause 7), to be kept abreast of the Vessel's hire (Clause 5), and to approve the insurance purchased by the charterer and the insured repairs to the Vessel (Clause 12).

Plaintiff argues, however, that "several Additional Clauses demonstrate that Zarepta retained significant technical management over the vessel as well as financial control over the operational activities of the vessel, which retention is incompatible with the creation of a bareboat charter." (Pl.'s Mem. Law Opp'n at 9.) This assertion is unsupported. While Additional Clause 47(d) provides that Zarepta shall approve Norfolk's technical management agreement with Hiltveit and that Norfolk will not dismiss the manager without Zarepta's consent (which could not be unreasonably withheld), it does not, as Plaintiff suggests, "retain for Zarepta significant technical management over the vessel." There is no evidence that Zarepta is involved to any degree in the managers' performance of their duties under the agreements or in the management of the Vessel. The charterer, not Zarepta, appointed the general managers, who appointed the technical managers. (See Def.'s Supplemental Submission dated

10

6/17/08, Attachments 1, 2.) Retaining the ability to ensure that a competent manager is appointed does not constitute retention of significant control or management.

Nor does Additional Clause 47(h) retain for Zarepta financial control over the operational activities of the Vessel. By requiring the charterer to put up security, specifically $4 million in an account controlled by Zarepta and the mortgagee, Additional Clause 47(h) only serves to replace the requirement of a bank guaranty in Clause 22 of the Barecon 89, which the parties struck. A clause establishing financial security of performance is normal in a bareboat charter. See Davis, supra, at 5. Plaintiff argues, however, that Additional Clause 47(h) is significantly different than Clause 22 of the Barecon 89 because it allows the charterer to spend up to $500,000 for the operation of the Vessel subject to the consent of Zarepta. The requirement of Zarepta's consent before the charterer deducts from the security in the Vessel, alone, does not preclude the charter from being a bareboat charter in view of agreement as a whole. Nor does the requirement of Zarepta's prior written consent before making material changes to the charterer's business render the charter anything less than a bonafide bareboat charter. Such modest assurances do not constitute the retention of control.

Moreover, the evidence indicates that the parties intended to enter into a bareboat charter. The general management agreement between Norfolk and Hiltveit refers to Norfolk's agreement with Zarepta as "an agreement to bareboat charter" the Vessel and to Norfolk as "the Owner." (Def.'s Supplemental Submission dated 6/17/08, Attachment 2 at 2). The technical management agreement refers to Norfolk as "Bare Boat Charterers" (id., Attachment 1 at 1), and to Hiltveit as the agent of the "Bare Boat Charterers" (id.). Naturally, the terms bareboat charterer and owner are used

11

interchangeably, as "[i]t has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as owner, generally called owner *pro hac vice*." Reed v. Steamship Yaka, 373 U.S. 410, 412 (1963) (footnote omitted). Based on the foregoing, it is reasonable to interpret that Hiltveit was referring to Norfolk when it told Plaintiff that it did everything possible "on behalf of owners of Rachel B" to complete the necessary corrective measures. (Carr Decl., Ex B.) Hiltveit appeared to use the word "owners" interchangeably with the "vessel interests." (Id.)

In view of these facts and the language of the charter agreement as a whole, the Court concludes that the charter agreement between Zarepta and Norfolk/Hiltveit is a true bareboat charter agreement. Plaintiff cannot sustain a valid prima facie case against Zarepta, *in personam*, as owner of the Vessel, to recover the layberth charges incurred by Hiltveit. Nor does Plaintiff appear to have an *in personam* claim against Zarepta based on privity of contract. Nothing in the record supports an allegation that Zarepta was party to the wharfage agreement between Plaintiff and Hiltveit. Although Plaintiff alleged in its complaint that it "made demand for payment upon Defendants" (Compl. ¶ 11), the email communications from Mr. Carr are directed to Hiltveit only, and not to Zarepta. (See Carr Decl., Ex. B.)

Since Plaintiff fails to sustain a valid prima facie case against Zarepta, the attachment of Zarepta's assets in the amount of $318,310.17 must be vacated. Additionally, Zarepta is entitled to an award of attorneys' fees in view of Plaintiff's refusal to release the attached funds after being advised by Zarepta's counsel of the bareboat charter's existence.

## CONCLUSION

For the foregoing reasons, Defendant Zarepta's motion to vacate the Court's Order for Process of Maritime Attachment dated May 7, 2008 (Doc. No. 4) is hereby granted, and attorneys' fees are awarded to Zarepta.

IT IS SO ORDERED.

Dated: New York, New York
      July 18, 2008

                                        Robert P. Patterson, Jr.
                                        U.S.D.J.

**Copies of this Order sent to:**

*Attorneys for Plaintiff*
Freehill, Hogan & Mahar, LLP
Attn: Don Philip Murnane, Jr
80 Pine Street
New York, NY 10005
(212) 425-1900
Fax: (212) 425-1901

*Attorneys for Defendant*
Holland & Knight LLP
Attn: William J. Honan
195 Broadway
New York, NY 10007
(212)-513-3516
Fax: (212)-385-9010